Present:  Chief Judge Decker, Judges Humphreys, Beales, Huff, O'Brien, AtLee, Malveaux,
            Athey, Fulton, Ortiz, Causey, Friedman, Chaney, Raphael, Lorish, Callins and White
Argued at Richmond, Virginia

**PUBLISHED**

DILLIRAJ BISTA

v.      Record No. 0904-21-4

COMMONWEALTH OF VIRGINIA

OPINION BY
JUDGE MARY GRACE O'BRIEN
SEPTEMBER 12, 2023

UPON A REHEARING EN BANC

FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
Stephen C. Shannon, Judge

Dawn M. Butorac, Public Defender, for appellant.

Katherine Quinlan Adelfio, Assistant Attorney General (Jason S.
Miyares, Attorney General, on brief), for appellee.


A jury convicted Dilliraj Bista of anal sodomy of a child under the age of 13, in violation

of Code § 18.2-67.1,[1] and aggravated sexual battery, in violation of Code § 18.2-67.3.[2]  On

appeal, a three-judge panel of this Court heard Bista's challenges to the admission of the child's

out-of-court statements under Code § 19.2-268.3 and to the admission of a video depicting the

child's forensic interview, which he argued violated his right to confrontation under the Sixth

Amendment of the United States Constitution.[3]  The panel affirmed the convictions with one

---

[1] Although forcible sodomy under Code § 18.2-67.1 includes "cunnilingus, fellatio,
anilingus, or anal intercourse," the indictment here specified only "anal intercourse."

[2] The jury acquitted Bista of a related rape charge.

[3] Bista also argued that the court erred by rejecting two proffered jury instructions and
limiting the scope of his closing argument.  The panel found no error, and Bista did not seek en
banc review of those issues.

judge dissenting as to the Confrontation Clause issue. *Bista v. Commonwealth*, 76 Va. App. 184 (2022). This Court granted Bista's petition for rehearing en banc and agreed to rehear the following assignment of error:

> The trial court erred by allowing the out[-]of[-]court statements of [R.P.][4] to be admitted as evidence pursuant to . . . Code § 19.2-268.3 after she had been declared incompetent to testify at trial. Even if her out[-]of[-]court statements satisfied the requirements of . . . Code § 19.2-268.3, the trial court further erred in admitting her statement to the forensic interviewer as it violated . . . Bista's confrontation rights under the [Sixth] Amendment.

## BACKGROUND

### I. Material Facts

In August 2018, R.P. was 11 years old and living with her younger brother and parents, Hem and Rita. R.P. has autism spectrum disorder, which impairs her socialization and ability to learn and communicate. R.P.'s family had immigrated from Nepal and formed a close relationship with Bista and his family, who were also Nepali. R.P. referred to Bista as "grandpa" and communicated with him through gestures and basic English and Nepali phrases.

On August 17, 2018, Bista had been staying at R.P.'s home while his wife and son were in Nepal. That evening, Hem prepared dinner in the kitchen with his own parents nearby, while Bista was outside on the back deck. Around 8:30 p.m., Rita went upstairs to shower and, when she returned downstairs at 8:45 p.m., she found Bista kneeling behind R.P. on the living room floor. R.P. was on her hands and knees in a "dog position" with her shorts and underpants pulled down. Rita screamed and took R.P. upstairs to question her with Hem. R.P. told her parents that Bista had "licked [her] on the front and back" and "put it on the front and tried to put it on the back." Rita put R.P.'s clothing in a plastic grocery bag and tied it shut. Bista initially denied

---

[4] We use initials to protect the minor child's privacy.

- 2 -

any wrongdoing, assuring Rita and Hem that he had been "playing" with the child, but he later admitted to them that he had "licked [her] private part." R.P.'s parents did not report the incident to police, fearing that the information would harm their family's status in the Nepali community. Bista moved to Hawaii the following week.

On January 29, 2019, R.P. told her special education teacher, Brian Rothe, that "the previous summer in August" she had been "raped by a family friend" who "looked like a grandpa." She told Rothe that the man had "gone back to Nepal" after her mother caught him "touching her inappropriately" and "kicked him out of the house." Rothe notified school administrators, who alerted Child Protective Services (CPS) about the allegations. The next day, CPS contacted Fairfax County Detective Thomas Gadell, Jr., to investigate.

At Detective Gadell's request, social worker Maria Bonilla conducted a video-recorded forensic interview of R.P. at SafeSpot Children's Advocacy Center on February 27, 2019.[5] Michele Thames, the executive director of SafeSpot, testified at a pretrial hearing that a "forensic interview" is "conducted in [a] neutral setting by a trained professional forensic interviewer" when "a child makes an allegation of child abuse." SafeSpot accepts "referrals" to conduct the interviews exclusively from "law enforcement and [CPS]." Thames stated that the techniques used in a forensic interview are "evidence-based" with questions that are "narrative and non-leading as best [as] can be." She explained that "[w]hen you are talking to a child you want the child to share information that they have. You don't want to ask them questions telling them what the answer is or may be."

---

[5] Detective Gadell arranged the forensic interview. He provided Bonilla details of the suspected abuse before she conducted the interview. Detective Gadell watched the interview on a closed-circuit television in an adjacent room, and Bonilla conferred with him to "make sure [he] didn't have any additional questions" before concluding the interview.

The interview lasted one hour and ten minutes.  After engaging in small talk with Bonilla for approximately 25 minutes, R.P. described the assault.  R.P. told Bonilla that "Grandpa Bista" and his family had visited her home for a "dinner party."  Bista found R.P. alone in the living room and forcefully kissed her by grabbing her neck.  R.P. said she tried to run away but Bista pulled her shirt "nine or ten times," causing her to fall.  Bista forced R.P. into a "dog" position and removed her shorts.  Pointing to her groin, R.P. explained that Bista's "mouth was going crazy" as he kneeled behind her and attempted to "lick" her "private part."  R.P. also said that Bista's penis "tr[ied] to go in her butt," but she later stated that he actually had anally sodomized her.  In sum, 2 minutes and 34 seconds of the interview were spent discussing Bista's anal penetration of R.P.  She stated that Bista had used his "flip phone" during the assault to video-record her "butt" and "private parts," but someone had since deleted the videos and the phone was "lost."

Police collected the grocery bag containing R.P.'s clothing worn during the assault.  After Bista's arrest and extradition from Hawaii, Detective Gadell obtained a buccal swab of his DNA.  Police also obtained buccal swabs of DNA from R.P. and her father Hem.  Subsequent testing established that Bista's DNA was in the "interior crotch" of R.P.'s underpants.  In June 2019, a forensic nurse conducted a sexual assault examination and concluded that R.P. had "no injuries" to her vagina or anus.

## II.  Material Proceedings Below

### A.  Preliminary Hearing and Indictment

A preliminary hearing occurred on September 5, 2019 in the Fairfax County Juvenile and Domestic Relations District Court.  The Commonwealth had provided Bista a copy of R.P.'s forensic interview video on August 15, 2019, three weeks earlier.

At the hearing, R.P. testified[6] that Bista's wife drove him to R.P.'s home before the incident. R.P. stated that Bista initially "just touched [her] private parts without taking [her] shorts off." Bista then removed his pants and exposed his "penis" before inserting it into R.P.'s vagina and "right into [her] butt." For the next "forty minutes," Bista kept "doing th[is] stuff over and over again," although R.P. "yelled at [Bista]" and "tried to leave the room several times."

Bista cross-examined R.P. about statements she made during the forensic interview. Some of these statements were not raised during her direct examination, and others contradicted her testimony. The Commonwealth did not object to any of the cross-examination. For example, at the preliminary hearing, R.P. testified that Bista did not "pull [her] shirt" during the assault, as she had related in the forensic interview, but he "prevented [her] from leaving" the room by "blocking" the entrance. She also testified that Bista "left his phone in [a] bag" during the assault, and—again, contrary to earlier statements she made during the forensic interview—he did not use it to photograph or record her. R.P. explained that she learned the terms "penis," "vagina," and "sex" through online research as a 9-year-old and, from the time she was "8 to 10 years old," she had watched videos of "people having sex" on the website "Pornhub."

In the forensic interview, R.P. described the anal penetration as "so uncomfortable" and made her feel like "she was going to throw up." During the preliminary hearing, R.P. also testified repeatedly on both direct and cross-examination about Bista's anal penetration. On direct examination, she stated, "he put it . . . into my butt" when she was questioned about what Bista did with his penis. On cross-examination, R.P. expanded on this testimony, referring again to Bista putting his penis "in my butt" and explaining that "first, he put it in my vagina and then

---

[6] Bista did not challenge R.P.'s competency to testify at the preliminary hearing.

he put it into my butt." She also stated that Bista had his penis "in [her] butt" longer than in her vagina.

The JDR court certified the charges to the grand jury, which subsequently indicted Bista for sodomy of a child under the age of 13 and aggravated sexual battery. The Commonwealth also directly indicted Bista for rape.

### B. Hearing on Motion to Admit Statements under Code § 19.2-268.3

Before trial, the Commonwealth moved to admit R.P.'s out-of-court statements to her parents, teacher Brian Rothe, and forensic interviewer Maria Bonilla under Code § 19.2-268.3, which makes admissible certain hearsay statements of child victims of specified crimes. At an evidentiary hearing, Rita testified that she saw Bista kneeling "very close" behind R.P., whose shorts were "below her knees." When questioned, R.P. told Rita that Bista "took his private part in [her] front and back both sides" and "entered it." R.P. also said that Bista "tried to put his organ inside her front and back" and "licked" her "private parts." Rita denied that R.P. had ever watched internet pornography and maintained that R.P. "never lies." Rita described R.P. as "mildly autistic" with a "mental and social" age of a "four[-] to five-year-old child."

Hem testified that immediately after the incident, R.P. said that Bista had "put his private part into [her] private part" and "licked it." Hem also denied that R.P. had ever lied to him, explaining that she suffered from cognitive deficits and could not distinguish "what is bad and what is good" because of her autism.

Rothe could not "remember exactly" whether R.P. had reported that her assailant had "attempted" or "actually accomplished" the alleged acts of sexual abuse. He also did not recall R.P. "saying anything about being licked." R.P. required an Individualized Education Program (IEP) at school because of her autism; Rothe explained that IEPs are designed to accommodate specialized needs of children with "learning" or "emotional" disabilities.

Bonilla was no longer employed at SafeSpot, but the Commonwealth called Michele Thames, SafeSpot's executive director, to authenticate the video from R.P.'s forensic interview. Thames also confirmed that Bonilla had followed "appropriate interview techniques." The court reviewed the video.

The court considered the factors enumerated in Code § 19.2-268.3 and found that, as the victim, R.P. had "personal knowledge of the event." Additionally, "extrinsic evidence" established Bista's "opportunity to commit the act," including Rita's personal observation of "physical interactions" that were "consistent with [R.P.'s] statement." The court found no motive for R.P. or her parents to fabricate the accusation, and it found Rothe, Rita, and Hem's testimony credible. Finally, the court found that R.P. provided a "very detailed recollection of the event" in the forensic interview, despite "some inconsistencies" and being "mildly autistic." The court concluded that "sufficient indicia of reliability" rendered her statements "inherently trustworthy" and therefore admissible under Code § 19.2-268.3.[7]

C. Hearing on R.P.'s Competency and Bista's Motion to Exclude Forensic Interview Video

Bista then sought to exclude the video of R.P.'s forensic interview based on the Sixth Amendment's Confrontation Clause, and he also challenged R.P.'s competency to testify at trial. The court conducted another evidentiary hearing.

Detective Gadell testified that at a pre-hearing meeting with the prosecutor, R.P. had disclosed that some of her preliminary hearing testimony was false. Specifically, R.P. said that Bista's wife had been "on vacation" during the incident and it was untrue that R.P. watched internet pornography. Hem testified regarding the meeting and denied that R.P. had intentionally lied. Rather, he explained that R.P.'s autism diminished her capacity to answer questions. Hem

_____

[7] The court ordered the Commonwealth to redact statements from the forensic interview video that were irrelevant to "the purported acts directed against [R.P.]."

stated that R.P. "cannot focus a long time" and "will just say things that aren't true without thinking about it" unless granted a "break" from questioning. Hem also denied that he or Rita had ever "coached" R.P.'s testimony about the assault.

R.P. was examined regarding her comprehension of an oath and ability to tell the truth. The prosecutor asked, "[I]f I were to say this wall behind you is black[,] w[ould] that be telling the truth or telling a lie?" R.P. replied, "Telling the truth," despite confirming that the wall was "beige." During cross-examination, R.P. told defense counsel, "The color of your car is probably 2268 or something." When defense counsel asked the number of people to whom R.P. had reported the assault, R.P. described an unrelated incident about being contacted via social media.

R.P. admitted that she had testified to "false facts" at the preliminary hearing: she stated that Bista's wife had not driven him to her home and she had "purposely lied" about watching internet pornography. She explained that, after the preliminary hearing, "My mom said that I don't watch the videos" and "said I was lying." R.P. testified, "My mom is trying to make me not think I watch" and "told me that it was a secret" and "does not want to tell that to the judge." R.P. also admitted that she had lied to her parents and teachers regarding unrelated matters. She maintained, however, that she was "telling the truth" about the assault and again described it in detail. Defense counsel asked R.P. specifically whether she had "ever changed [her] story about" the assault. R.P. responded, "Yeah," but maintained, "I just changed the part where [Bista's] grandma came into the house."[8]

The court found that R.P. had the capacity to "observe," "recall," and "communicate" events "to the extent that she has alleged to have been at home with [Bista] and has a

---

[8] From context, it appears that R.P. was referring to Bista's wife—not grandmother— driving him to R.P.'s house.

recollection." The court also found that Rita "had some influence" on R.P's memory of "whether she was sodomized." On balance, the court determined that R.P. did not have the "capacity to comprehend the legal significance of an oath," "distinguish truth from a falsehood," or "understand the questions propounded and make intelligent answers." The court therefore concluded that R.P. was "not competent to testify at this time."

The court deferred ruling on the admissibility of R.P.'s forensic interview statements and set a hearing for further argument.

### D. Hearing on Motions to Reconsider Admissibility under Code § 19.2-268.3 and to Exclude Forensic Interview on Confrontation Clause Grounds

Bista next asked the court to reconsider its ruling on the admissibility of R.P.'s out-of-court statements under Code § 19.2-268.3. The court denied the motion, expressly considering each statutory factor. The court concluded that "the totality of the circumstances" established that R.P.'s out-of-court statements to her parents, teacher, and Bonilla were "inherently trustworthy," notwithstanding R.P.'s "age," "mental infirmities," and prior "inconsistent statements." The court also found that the DNA evidence and Rita's testimony describing the incident sufficiently corroborated Bista's alleged acts of sexual abuse.

On the motion to exclude the forensic interview video on Confrontation Clause grounds, the Commonwealth "concede[d] that statements made during [R.P.]'s forensic interview [are] likely testimonial hearsay" but argued that Bista's "Sixth Amendment right to confront R.P. regarding the allegations ha[d] been satisfied" because "R.P.'s forensic interview was substantially similar to her testimony at the preliminary hearing, and because [defense] counsel was given an adequate opportunity to cross[-]examine R.P. about the allegations at the preliminary hearing."

During argument, Bista's counsel conceded that, at the preliminary hearing, she had a copy of the forensic interview video and that the Commonwealth never objected during R.P.'s cross-examination. Bista's counsel argued, however, that R.P.'s cross-examination was insufficient because at the time "Bista was not charged with the crime of rape," R.P. was likely incompetent because of her autism, counsel had not received complete discovery concerning R.P.'s statements about the incident or school records disclosing R.P.'s IEP history, and R.P. later admitted to testifying falsely at the preliminary hearing.

The court found that R.P.'s statements to Bonilla during the forensic interview were testimonial hearsay but Bista had "the opportunity at the preliminary hearing to cross[-]examine [R.P.] about the specific allegations that she's making in the statements." The court concluded that admitting R.P.'s forensic interview statements would not violate the Confrontation Clause.[9]

### E. Trial and Post-Conviction Proceedings

R.P. did not testify at trial. During opening statements, the Commonwealth and Bista advised the jury that R.P. was unavailable because the court had found her incompetent to testify.

The Commonwealth introduced the video of R.P.'s forensic interview and the transcript of her preliminary hearing testimony. Rita and Hem testified regarding the August 2018 assault, and Rothe recounted R.P.'s disclosures. The forensic nurse who had conducted R.P.'s June 2019 sexual assault examination testified that the results were "normal," meaning "no injuries were found."

Mimi Smith, a forensic scientist with the Virginia Department of Forensic Science, qualified as an expert in "forensic biology and DNA and body fluids." Using "Y-chromosome"

---

[9] The court also granted the Commonwealth's separate motion to admit a transcript of R.P.'s preliminary hearing testimony at trial, over Bista's objection. Bista did not assign error to that ruling.

DNA analysis, she developed a "major profile" from a DNA mixture found in the interior of the "crotch" of the underpants R.P. had worn during the assault; the major profile comprised DNA from two male contributors. Smith eliminated Hem as a contributor but could not eliminate Bista—or "any of his patrilineally related male relatives"—as a contributor to the major profile. Bista was the only member of his family present during the assault.

During his defense, Bista called Dr. Thomas McClintock, an expert in forensic DNA analysis. Dr. McClintock testified that DNA can transfer among surfaces and degrade from contaminants. He opined that because R.P.'s clothing had been stored in a tied plastic bag for approximately six months, the DNA in R.P.'s underpants may not have originated from Bista's direct physical contact and that "moisture" and "microbial growth" potentially contaminated the DNA. Dr. McClintock also testified that he had reviewed Smith's "raw data" and "could not exclude" Hem as a contributor to the major profile of the DNA mixture recovered from the interior crotch of R.P.'s underpants. In rebuttal, Smith testified that she observed no evidence of mold or DNA degradation during her analysis.

Bista introduced a transcript of R.P.'s testimony from the competency hearing and the court's order finding her incompetent to testify. He also called Dr. Brandie Bartlett, an expert in clinical and child psychology, who testified that "people with autism have more difficulty maintaining lies." Based on her review of R.P.'s school records,[10] the transcript of her preliminary hearing testimony, and the forensic interview video, Dr. Bartlett opined that R.P. had "memory issues" and a limited capacity to "recall the details of a story in the correct sequence." Additionally, Dr. Bartlett noted that R.P.'s academic history reflected that she required IEPs,

_____

[10] The court admitted R.P.'s school records into evidence.

- 11 -

failed standardized tests, and exhibited "hyperactivity," "inattentiveness," and "significant delays in expressive and receptive language."

The Commonwealth argued to the jury that R.P.'s allegations were credible, emphasizing consistencies among R.P.'s out-of-court statements, prior testimony, and the DNA evidence. Bista countered that the "Commonwealth's entire case rises and falls on whether or not you believe [R.P.]" and asserted there was "absolutely no reason" to do so. Citing school records evaluating R.P.'s learning and behavioral patterns, Bista argued that she was unable to provide an accurate account or discern the truth. Bista further argued that autistic children "can't maintain their lie and that's exactly what we have here." He urged the jury to disbelieve R.P. because her competency hearing testimony proved that she lacked any "understanding of what it means to tell the truth or to tell a lie," which he asserted was the reason R.P. had been declared incompetent to testify. Noting multiple inconsistencies in R.P.'s accounts—including numerous examples from R.P.'s forensic interview statements—Bista argued that R.P. "is incredibly influenced by things her parents say," her assertions were sometimes physically impossible, and "[w]e know that every single thing that [she] has said has been inconsistent with something previously." Bista concluded that R.P. "cannot be believed."

The jury convicted Bista of sodomy and aggravated sexual battery but acquitted him of rape.

Bista moved to set aside the verdict, arguing inter alia that R.P.'s out-of-court statements did not meet the standard for admissibility under Code § 19.2-268.3 and the admission of the forensic interview video violated his Confrontation Clause right. Bista reiterated that R.P.'s cross-examination during the preliminary hearing did not adequately protect his constitutional right because, after the hearing, the Commonwealth brought the additional rape charge, Bista received more discovery concerning R.P.'s out-of-court statements and school records, R.P.

admitted to falsely testifying at the preliminary hearing, and the court found her incompetent to testify.

In response, the Commonwealth reiterated that R.P.'s statements were admissible under Code § 19.2-268.3 because they were inherently trustworthy and corroborated by other evidence. Regarding the forensic interview, the Commonwealth argued for the first time that R.P.'s statements to Bonilla were nontestimonial and therefore did not implicate the Confrontation Clause. Even if the statements were testimonial, the Commonwealth argued that Bista's constitutional right was satisfied because he was able to confront R.P. during the preliminary hearing.

After considering the filings and argument of counsel, the court ruled that "[t]he motion to set aside the verdict respectfully is denied."

## ANALYSIS

### Standard of Review

Appellate courts "review a trial court's decision to admit or exclude evidence using an abuse of discretion standard" and "will not disturb a trial court's decision to admit evidence absent a finding of abuse of that discretion." *Kenner v. Commonwealth*, 299 Va. 414, 423 (2021) (quoting *Avent v. Commonwealth*, 279 Va. 175, 197 (2010)). When determining whether an abuse of discretion occurred, "we do not substitute our judgment for that of the trial court. Rather, we consider only whether the record fairly supports the trial court's action." *Id.* (quoting *Carter v. Commonwealth*, 293 Va. 537, 543 (2017)). "Only when reasonable jurists could not differ can we say an abuse of discretion has occurred." *Lambert v. Commonwealth*, 70 Va. App. 740, 749 (2019) (quoting *Thomas v. Commonwealth*, 44 Va. App. 741, 753, *adopted upon reh'g en banc*, 45 Va. App. 811 (2005)). "The abuse-of-discretion standard [also] includes review to determine that the discretion was not guided by erroneous legal conclusions." *Carter*, 293 Va. at

543-44 (alteration in original) (quoting *Porter v. Commonwealth*, 276 Va. 203, 260 (2008)). "In determining whether the trial court made an error of law, 'we review the trial court's statutory interpretations and legal conclusions *de novo*.'" *Auer v. Commonwealth*, 46 Va. App. 637, 643 (2005) (quoting *Rollins v. Commonwealth*, 37 Va. App. 73, 79 (2001)); *see also Cortez-Rivas v. Commonwealth*, 300 Va. 442, 444 (2022) (observing that appellate courts review de novo "whether the admission of evidence violates a defendant's confrontation right" (quoting *Logan v. Commonwealth*, 299 Va. 741, 745 (2021))).

"The measure of the burden of proof with respect to factual questions underlying the admissibility of evidence is proof by a preponderance of the evidence." *Campos v. Commonwealth*, 67 Va. App. 690, 702 (2017) (quoting *Witt v. Commonwealth*, 215 Va. 670, 674 (1975)). A trial court resolves factual questions underlying admissibility. *Bloom v. Commonwealth*, 262 Va. 814, 821 (2001). These findings are binding on appeal "unless 'plainly wrong' or without evidence to support them." *Campos*, 67 Va. App. at 702 (quoting *McGee v. Commonwealth*, 25 Va. App. 193, 198 (1997) (en banc)).

I. Admissibility of R.P.'s Out-of-Court Statements under Code § 19.2-268.3

Code § 19.2-268.3 provides a hearsay exception for out-of-court statements of child victims of specified crimes, provided that (1) "the time, content, and totality of circumstances surrounding the statement[s] provide sufficient indicia of reliability" to render the statements "inherently trustworthy," and (2) the child testifies or is declared unavailable to testify. Code § 19.2-268.3(B). To determine whether the statements are "inherently trustworthy," a court "may consider" six nonexclusive factors. Code § 19.2-268.3(B)(1)(a)-(f). If the child is declared unavailable to testify, the statute requires "corroborative evidence of the act relating to an alleged offense against children." Code § 19.2-268.3(B)(2)(b).

Bista contends that R.P.'s out-of-court statements concerning the sexual abuse were inadmissible under Code § 19.2-268.3 because "[o]nce [R.P.] was declared incompetent to testify, her statements no longer met the requirement of being inherently trustworthy." He also argues the court erred in finding corroborative evidence of the crimes, as required when a child declarant is unavailable to testify.

A. Competency and Admissibility under Code § 19.2-268.3

A child's incompetence to testify does not categorically bar the admissibility of the child's out-of-court statements under Code § 19.2-268.3. *See Chenevert v. Commonwealth*, 72 Va. App. 47, 57 (2020) (holding that the "only" limitations on admissibility under Code § 19.2-268.3 are those the statute expressly contains); *see also Ohio v. Clark*, 576 U.S. 237, 250 (2015) (recognizing that a child sexual assault victim's incompetency to testify does not per se render the child's out-of-court disclosures inadmissible). To the contrary, Code § 19.2-268.3(B)(2)(b) expressly contemplates that some children will be unavailable and addresses that circumstance by requiring "corroborative evidence of the act" giving rise to the charged offense. Nevertheless, Bista insists that the specific facts rendering R.P. incompetent to testify also deprived her out-of-court statements of inherent trustworthiness and the court erred by reaching "two completely opposite" conclusions. We disagree.

A child's competence to testify is a distinct issue from the admissibility of the child's out-of-court statements under Code § 19.2-268.3. Generally, "a child is competent to testify if he or she possesses the capacity to observe, recollect, communicate events, and intelligently frame answers to the questions asked of him or her with a consciousness of a duty to speak the truth." *Greenway v. Commonwealth*, 254 Va. 147, 153 (1997); *see also Cross v. Commonwealth*, 195 Va. 62, 64 (1953). In making a competency determination, a court "must consider the child's age, his [or her] intelligence or lack of intelligence, and his [or her] sense of

moral and legal responsibility." *Greenway*, 254 Va. at 153 (quoting *Hepler v. Hepler*, 195 Va. 611, 619 (1954)); *see also* Va. R. Evid. 2:601(b) ("A court may declare a person incompetent to testify if the court finds that the person does not have sufficient physical or mental capacity to testify truthfully, accurately, or understandably.").

Admissibility of a child's out-of-court statement, however, hinges on the statement's inherent trustworthiness under Code § 19.2-268.3(B), which provides a broad and nonexclusive range of factors for consideration:

> a. The child's personal knowledge of the event;
>
> b. The age, maturity, and mental state of the child;
>
> c. The credibility of the person testifying about the statement;
>
> d. Any apparent motive the child may have to falsify or distort the event, including bias or coercion;
>
> e. Whether the child was suffering pain or distress when making the statement; and
>
> f. Whether extrinsic evidence exists to show the defendant's opportunity to commit the act[.]

Code § 19.2-268.3(B)(1)(a)-(f). These factors go beyond considering whether the child victim understands the duty to tell the truth, which is at the core of a competency determination; they look to other "indicia of reliability" relating to the circumstances of the out-of-court disclosures. *See id.*

We acknowledge there are similarities between the admissibility and competency analyses. For example, a statement's "inherent trustworth[iness]" may relate to a child's "age, maturity, and mental state" and an "apparent motive . . . to falsify or distort the event." Code § 19.2-268.3(B)(1)(b), (d). Similarly, a competency determination considers the child's age, intelligence, and capacity to understand a duty to tell the truth. *See Greenway*, 254 Va. at 153.

- 16 -

Despite the overlap, courts may still weigh these factors differently, depending on the distinct facts and circumstances each individual case presents, and reach different conclusions regarding a child's competency and a statement's inherent trustworthiness.

Here, R.P.'s autism and developmental delays were certainly relevant to both her competency to testify and the admissibility of her out-of-court statements; however, her mental state did not compel the court to reach the same conclusion on both issues, given the numerous other considerations factoring into the separate analyses. In determining that R.P. was incompetent to testify, the court found that R.P.'s mental state was dispositive, as it impaired her "capacity to comprehend the legal significance of an oath," "distinguish truth from a falsehood," and "understand the questions propounded and make intelligent answers." In ruling that R.P.'s out-of-court statements were admissible, however, the court had discretion to consider her mental state as one factor among many, take into account the totality of the circumstances surrounding the statement, and still make a finding of inherent trustworthiness. *See* Code § 19.2-268.3(B)(1) (stating that the court "*may* consider" the "age, maturity, and mental state of the child" along with other factors (emphasis added)).

Bista further argues that R.P.'s admission to giving "false facts" during the preliminary hearing, which factored into the court's competency determination, necessarily made her out-of-court statements inherently untrustworthy. Again, we disagree. To the extent that R.P. stated at the competency hearing that she offered "false facts" during the preliminary hearing, none related to the sexual assault itself. R.P. stated that the "false facts" concerned (1) whether Bista's wife dropped Bista off at R.P.'s home, and (2) whether R.P. watched internet pornography. Therefore, although R.P.'s giving of "false facts" impacted the competency determination, the court had discretion to find that her out-of-court statements were inherently trustworthy when considering the totality of circumstances under Code § 19.2-268.3(B)(1).

- 17 -

B.  Weighing of Statutory Factors

Bista further contends that the court erroneously weighed the factors enumerated in Code § 19.2-268.3 to conclude that R.P.'s statements were inherently trustworthy.  He argues that inconsistencies in R.P.'s multiple accounts of the assault, considered with her impaired "maturity and mental state" made her statements "inherently untrustworthy."  Bista also argues that the court should have concluded from R.P.'s history of "attention[-]seeking behavior" that she had a "motive to falsify her claims."  In essence, Bista asks us to reassess the court's factual conclusions.

We are "bound by the trial court's 'findings of historical fact unless "plainly wrong" or without evidence to support them.'"  *Park v. Commonwealth*, 74 Va. App. 635, 645 (2022) (quoting *McGee*, 25 Va. App. at 198); *see McMillan v. Commonwealth*, 277 Va. 11, 18 (2009) (stating that, on appeal, "great deference is given to the factfinder who, having seen and heard the witnesses, assesses their credibility and weighs their testimony" (quoting *Young v. Commonwealth*, 275 Va. 587, 590 (2008))).  Thus, we must defer to the factfinder's responsibility "to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts."  *Abdullah v. Commonwealth*, 53 Va. App. 750, 755 (2009) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

The record supports the court's conclusion that R.P.'s statements to her parents, teacher, and Bonilla were inherently trustworthy.  The evidence established R.P.'s "personal knowledge of the event" and reflected detailed and largely consistent accounts of the assault to her parents, teacher, and Bonilla.  Code § 19.2-268.3(B)(1)(a).  Rita and Hem consistently testified that, immediately after the assault, R.P. reported that Bista had touched and "licked" her "private parts."  Consistent with that disclosure, R.P. told her teacher, Rothe, that she had been raped by a family friend the previous August.  The video of R.P.'s forensic interview demonstrated that R.P.

- 18 -

provided a detailed account of the assault consistent with her previous reports. Furthermore, despite some discrepancies, R.P.'s testimony "did not waiver" with respect to the essential acts constituting the offenses. *See Nobrega v. Commonwealth*, 271 Va. 508, 518 (2006) (holding that a "child's mental health history" and "inconsistencies" in the child's account "bear[] on the weight to be given her testimony" but do not render the testimony inherently incredible). Moreover, the court expressly considered R.P.'s "age, maturity, and mental state" and determined that she had "a very detailed recollection of the event," notwithstanding "some inconsistencies" in her account and being "mildly autistic." *See* Code § 19.2-268.3(B)(1)(b). The court also had the opportunity to watch and listen to Rita, Hem, and Rothe testify concerning R.P.'s statements and concluded that they were credible. Code § 19.2-268.3(B)(1)(c).

Although R.P. engaged in "attention-seeking" behavior at school, no evidence suggested she did so at home or in other settings. Nor did any evidence indicate that she harbored animus toward Bista before the incident. Furthermore, Hem testified that he did not "coach" R.P.'s testimony, Bista was a close family friend, and Hem had refrained from contacting police due to cultural norms. From that evidence, the court reasonably concluded that neither R.P. nor her family had a motive to "falsify or distort" the offenses. Code § 19.2-268.3(B)(1)(d). The court also found no evidence that R.P. was "suffering pain or distress" during the disclosures. Code § 19.2-268.3(B)(1)(e). Finally, the record contained "extrinsic evidence" establishing Bista's "opportunity to commit" the assault. Code § 19.2-268.3(B)(1)(f). Rita found Bista kneeling on the floor behind R.P., who was on her hands and knees and partially undressed. Additionally, Bista's DNA was inside R.P.'s underpants, and he admitted to both parents that he had "licked" R.P.'s "private part."

Viewing the evidence under our deferential standard of review, we cannot conclude that the court's findings were plainly wrong or without evidentiary support. *Park*, 74 Va. App. at

645. Accordingly, we hold that the court did not abuse its discretion when weighing the statutory factors and finding R.P.'s statements "inherently trustworthy" under Code § 19.2-268.3.

### C. Corroborative Evidence

Finally, Bista contends that "[a]bsolutely no corroborative evidence existed" of the alleged acts of rape, sodomy, and aggravated sexual battery to satisfy Code § 19.2-268.3(B)(2)(b). He argues that the evidence established at most his mere "opportunity" to commit the crimes, which he contends was insufficient.

Code § 19.2-268.3 does not define "corroborative evidence." In general, "when a particular word in a statute is not defined therein, a court must give it its ordinary meaning." *Moyer v. Commonwealth*, 33 Va. App. 8, 35 (2000) (en banc). "Corroboration" denotes "confirmation or support by additional evidence or authority." *Corroboration*, *Black's Law Dictionary* (11th ed. 2019). We have stated that, in general, "[c]orroborative evidence is such evidence as tends in some degree, of its own strength and independently, to support some essential allegation or issue." *Haas v. Commonwealth*, 74 Va. App. 586, 629 (2022) (quoting *Commonwealth v. Proffitt*, 292 Va. 626, 638 (2016)). Such evidence "tends to confirm and strengthen" a witness's testimony by "show[ing] the truth, or the probability of its truth." *Penn v. Manns*, 221 Va. 88, 93 (1980) (quoting *Brooks v. Worthington*, 206 Va. 352, 357 (1965)). Corroborative evidence need not "be sufficient to support a verdict" or "remove[] all doubt," but only provide "more strength than was had before." *Id.* (quoting *Brooks*, 206 Va. at 357). No formula exists for determining adequate corroboration; "ea[ch] case must be decided upon its own facts and circumstances." *Seaboard Citizens Nat'l Bank v. Revere*, 209 Va. 684, 693 (1969) (quoting *Brooks*, 206 Va. at 357). Corroborative evidence includes "independent evidence connecting the declarant with the confessed crime," such as "testimony from other witnesses" and "physical evidence." *Rankins v. Commonwealth*, 31 Va. App. 352, 362 (2000), *overruled on*

- 20 -

*other grounds in Crawford v. Washington*, 541 U.S. 36, 52 (2004).  Additionally, admissions from a defendant corroborating challenged hearsay statements are often persuasive.  *See Henderson v. Commonwealth*, 285 Va. 318, 330-31 (2013).

The record contains corroborative evidence of Bista's crimes.  Forensic testing established that Bista's DNA was found in the interior crotch of R.P.'s underpants.  Rita also testified that she observed Bista kneeling behind R.P., whose shorts were drawn below her knees.  Finally, Bista confessed that he "licked" R.P.'s "private part."  Collectively, that corroborative evidence satisfies Code § 19.2-268.3(B)(2)(b).[11]

## II.  R.P.'s Forensic Interview and the Confrontation Clause

Bista next argues that even if the statements were otherwise admissible under Code § 19.2-268.3, the court's admission of the forensic interview video violated his Sixth Amendment right to confront R.P.  He contends that his cross-examination of R.P. at the preliminary hearing was insufficient because the forensic interview video "presented new and corroborative evidence to the jury and was not subject to cross-examination at any point— neither the preliminary hearing nor the jury trial."

The Sixth Amendment's Confrontation Clause provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."  U.S. Const. amend. VI.  In *Crawford v. Washington*, the United States Supreme Court held that when a witness is declared unavailable and does not testify at trial, the Confrontation Clause prohibits admitting the witness's prior statements if the statements constitute

_____

[11] In his brief, Bista asks this Court to conclude that there was insufficient corroborative evidence based on cases concerning corpus delicti necessary to corroborate a defendant's extrajudicial confession.  The authorities upon which Bista relies are inapposite because they address a distinct quantum of proof: *sufficiency* to sustain a conviction, rather than *admissibility* of evidence.

"testimonial" hearsay and there was no prior opportunity for cross-examination. 541 U.S. at 68; *see also Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 309 (2009) (stating that the Sixth Amendment bars a witness's testimonial statement against a defendant "unless the witness appears at trial or, if the witness is unavailable, the defendant had a prior opportunity for cross-examination").

A statement is testimonial if, viewed objectively and in full context, it was given with the "primary purpose of creating an out-of-court substitute for trial testimony." *Clark*, 576 U.S. at 245 (quoting *Michigan v. Bryant*, 562 U.S. 344, 358 (2011)). This "primary purpose" test considers, among other factors, the intent of the declarant under the circumstances. *See id.* at 240 (noting that "neither the child [declarant] nor his teachers had the primary purpose of assisting in [the] prosecution"). "Statements by very young children will rarely, if ever, implicate the Confrontation Clause." *Id.* at 247-48. We need not reach the issue of whether R.P.'s forensic interview statements were testimonial, however, because we find that Bista had a constitutionally adequate opportunity to cross-examine R.P. about those statements at the preliminary hearing.[12]

"[T]he Confrontation Clause guarantees only an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Campos*, 67 Va. App. at 703 (alteration in original) (emphasis added) (quoting *Abney v. Commonwealth*, 51 Va. App. 337, 350 (2008)); *accord Massey v. Commonwealth*, 67 Va. App. 108, 134 (2016); *see also Clark*, 576 U.S. at 243 ("The Sixth Amendment . . . prohibits the introduction of testimonial statements by a nontestifying witness,

---

[12] "As an appellate court, we seek the 'best and narrowest ground available' for our decision." *Harvey v. Commonwealth*, 65 Va. App. 280, 285 n.2 (2015) (quoting *Armstead v. Commonwealth*, 56 Va. App. 569, 576 (2010)).

unless the witness is 'unavailable to testify, and the defendant had had a prior opportunity for cross-examination.'" (quoting *Crawford*, 541 U.S. at 54)).

Assuming without deciding that R.P.'s statements during the forensic interview were testimonial, they were admissible because Bista's Sixth Amendment confrontation right was satisfied at the preliminary hearing when he cross-examined R.P. regarding substantially similar testimony.[13] During the forensic interview, R.P. told Bonilla that Bista had visited her home for a dinner party, found her alone in the living room, and forcefully kissed her by grabbing her neck. R.P. said that when she tried to run away, Bista pulled her shirt several times, forced her into a "dog" position, and removed her shorts. Bista "lick[ed]" her "private part," and his penis "tr[ied] to go into her butt." R.P. also told Bonilla that Bista used his phone to record her but that someone had since deleted the videos and the phone was lost. At the preliminary hearing, R.P. testified that Bista initially "just touched [her] private parts without taking [her] shorts off" and then removed his pants and inserted his penis into her vagina and "butt." R.P. testified that Bista repeated the conduct for "forty minutes" and she "tried to leave the room several times."

During cross-examination, Bista elicited testimony that contradicted some of R.P.'s forensic interview statements. R.P. testified that Bista did not "pull [her] shirt" during the assault, but he prevented her from leaving by "blocking" the entrance. R.P. also said that Bista

---

[13] During proceedings below, the Commonwealth initially took the position that R.P.'s forensic interview statements were testimonial. In response to Bista's motion to set aside the verdict, however, the Commonwealth argued for the first time that the statements were nontestimonial. In ruling on Bista's motion, the court did not expressly address the testimonial/nontestimonial dispute but simply stated, "[t]he motion to set aside the verdict respectfully is denied." Neither the Commonwealth's change-of-position, nor the court's nonspecific ruling on the motion to set aside, prevents us from resolving the Confrontation Clause issue on a basis that is supported by the record—i.e., by affirming the court's pre-trial ruling that admission of the forensic interview video did not violate the Confrontation Clause because Bista had an adequate opportunity to cross-examine R.P. at the preliminary hearing. *See Perry v. Commonwealth*, 280 Va. 572, 580 (2010) (providing that an appellate court can affirm a judgment for any reason supported by the record).

"left his phone in [a] bag" and did not use it to photograph or record her, as she had said during the forensic interview. Bista referred to these inconsistencies in his closing argument in an attempt to buttress his challenge to R.P.'s credibility.

Additionally, the record reflects that Bista's cross-examination of R.P. went well beyond the scope of the direct examination and included questions concerning events before and after the assault, a visit R.P. made to Bista's house after the assault, whether R.P. watched pornography, and people to whom R.P. talked about the case.

Thus, at the preliminary hearing, R.P. testified in open court, under oath, and Bista both had the opportunity to, and did, cross-examine her without objection on a multitude of issues, including inconsistent statements she had made during the forensic interview. Although he did not introduce or expressly refer to the forensic interview, Bista had received a copy of the video three weeks before the preliminary hearing and could have cross-examined R.P. even more directly regarding any inconsistent statements. *See* Va. R. Evid. 2:613 (allowing impeachment by showing that the witness had previously made statements inconsistent with her testimony); *see also McCarter v. Commonwealth*, 38 Va. App. 502, 506-07 (2002). The fact that Bista chose not to pursue or expand upon his questioning does not mean his constitutional rights were violated. *See Campos*, 67 Va. App. at 703.

Bista contends that R.P.'s cross-examination at the preliminary hearing was defective because at that time: (1) Bista "did not face a rape charge"; (2) "neither complete discovery nor all of [R.P.]'s school records had been disclosed"; (3) Bista was unaware of "additional statements to [R.P.'s] parents and her teacher" admitted at trial; (4) R.P. "purposefully" lied regarding certain facts; and (5) R.P.'s autism—"the condition that rendered her incompetent"—made her cross-examination "meaningless."

- 24 -

This Court rejected similar arguments in *Massey*. In *Massey*, the victim in a prosecution for rape and abduction died after testifying at the preliminary hearing but before trial. 67 Va. App. at 118-19. During the preliminary hearing, the victim testified that she was unable to recall details of the incident. *Id.* at 116-18. After the preliminary hearing, the Commonwealth indicted Massey on an additional charge of abduction with intent to defile. *Id.* at 118. The Commonwealth also disclosed phone records and photographs that contradicted the victim's preliminary hearing testimony. *Id.* Massey moved *in limine* to exclude the victim's preliminary hearing testimony from trial, arguing that admitting the preliminary hearing transcript into evidence would violate the Confrontation Clause. *Id.* He contended that he had not had a full opportunity to cross-examine the victim at the preliminary hearing because, after the hearing, the Commonwealth indicted him on the additional charge and disclosed phone records he could have used to impeach the victim. *Id.* Massey also argued that the victim's forgetfulness had rendered her functionally "unavailable." *Id.* The court denied the motion. *Id.* At trial, Massey introduced numerous text messages that contradicted the victim's "memory lapses" and otherwise impeached her credibility. *Id.* at 134.

On appeal, Massey claimed that the admission of the victim's preliminary hearing testimony violated his right to confrontation. *Id.* at 123-24. This Court held that the additional charge was irrelevant because it arose from the same "factual basis" as the others and Massey had cross-examined the victim regarding those facts. *Id.* at 136. The untimely disclosure of the phone records was also inconsequential because "[t]he fact that additional information that might have been used in the examination of a witness is discovered after the witness testifies does not render the examination infirm." *Id.* at 129. Further, by introducing the victim's contradictory text messages, Massey had impeached the victim's credibility at trial "through other means." *Id.* at 128. Accordingly, we found no violation of the Confrontation Clause. *Id.* at 137.

Although *Massey* concerned the admissibility of preliminary hearing testimony, we nevertheless find the case instructive on the issue presented here—the admissibility of out-of-court statements that were available during, and substantially similar to, the preliminary hearing testimony. As in *Massey*, it is immaterial that the Commonwealth indicted Bista for rape after the preliminary hearing because the new charge stemmed from the same "factual basis" and Bista rigorously cross-examined R.P. regarding those facts. *Id.* at 136. Although Bista could have used the previously-undisclosed school records or statements to conduct a more thorough cross-examination of R.P. had she testified at trial, that circumstance "[did] not render the examination infirm" because he introduced the impeaching information into evidence at trial. *Id.* at 129. Notwithstanding R.P.'s later admission that she had lied about irrelevant facts at the preliminary hearing, Bista extensively cross-examined her specifically about her false testimony during the subsequent competency hearing and introduced that transcript into evidence. Finally, to the extent that Bista contends that R.P.'s autism rendered her de facto incompetent—and therefore "unavailable"—during the preliminary hearing, this Court rejected Massey's analogous argument. *Id.* at 133-34. Moreover, Bista never challenged R.P.'s competency to testify at the preliminary hearing. Indeed, he invoked R.P.'s autism to attack her credibility at trial by arguing that her mental condition made her incapable of telling the truth. "That this credibility attack did not result in an acquittal does not mean that [Bista] was denied his right of cross-examination." *Id.* at 134.

Bista further argues that R.P.'s cross-examination at the preliminary hearing was defective because the "forensic interview was not introduced at the preliminary hearing." However, as stated above, Bista had a copy of the forensic interview, could have used it to impeach R.P.'s preliminary hearing testimony, and in fact did question her about inconsistencies in her account of the assault. His questions, clearly based on the contents of the forensic

interview that had been provided to him some three weeks earlier, were presented without objection from the Commonwealth's attorney or limitation by the district court.

Additionally, on the facts of this case, we find that the opportunity for constitutionally adequate cross-examination did not require the Commonwealth to affirmatively introduce or elicit testimony concerning the forensic interview video at the preliminary hearing.[14] Bista's reliance on *Melendez-Diaz* and *Cypress v. Commonwealth*, 280 Va. 305 (2010), for this argument is misplaced. In *Melendez-Diaz*, the Supreme Court held that the Sixth Amendment protected a defendant's right to confront forensic witnesses who swore to certificates of analysis establishing that substances connected to the defendant contained cocaine. 557 U.S. at 307-11, 329. The defendant's mere "ability to subpoena the analysts" did not preserve his confrontation right, as the subpoena power is "no substitute for the right of confrontation." *Id.* at 324. The Court explained that "the Confrontation Clause imposes a burden on the prosecution to present its witnesses, not on the defendant to bring those adverse witnesses into court." *Id.* The Confrontation Clause cannot be "replaced by a system in which the prosecution presents its

---

[14] The dissent claims that Bista could not ask specific questions about the statements R.P. made during the forensic interview. But he did. In fact, his cross-examination alluded to some statements R.P. made during the forensic interview which were not mentioned in her direct examination or differed from her specific statements on direct examination. Further, the statements contained in the forensic interview addressed the precise topic before the court in the preliminary hearing—the circumstances surrounding the sexual abuse.

The record is devoid of evidence to support the dissent's speculation that had Bista conducted a more thorough cross-examination, he would have "exceed[ed] the limited purpose of a preliminary hearing." Bista's questions on cross-examination were presumably proper: they were not objected to by the Commonwealth, and Bista's cross-examination was not limited by the judge.

The dissent also raises the specter that the forensic interviewer "may have (unintentionally) led [R.P.] into changing her testimony." Again, this contention is without support in the record. In fact, the only testimony at trial concerning the circumstances of the forensic interview was elicited from the executive director of SafeSpot, who described an interview "conducted in [a] neutral setting by a trained professional forensic interviewer," explained the protocols used by the interviewer, and who testified that she had observed the video of the forensic interview between R.P. and Bonilla.

evidence via *ex parte* affidavits and waits for the defendant to subpoena the affiants if he chooses." *Id.* at 324-25.

Applying *Melendez-Diaz*, the Supreme Court of Virginia held in *Cypress* that a former statute requiring defendants to call forensic analysts as witnesses "placed an impermissible burden" on them to call adverse witnesses and "did not adequately protect their Confrontation Clause rights." 280 Va. at 318.

Unlike *Melendez-Diaz* and *Cypress*, Bista had more than a mere "ability to subpoena" the testimonial evidence against him; he actually had the forensic interview in his possession and the ability to use it for impeachment purposes at the preliminary hearing. *Cf. Melendez-Diaz*, 557 U.S. at 324. This is not a situation where Bista was required to call an adverse witness and thereby "relieve[] the prosecution of its burden to present its witnesses against [him]." *Cypress*, 280 Va. at 316. To the contrary, the Commonwealth had already called R.P.; Bista simply had to make a strategic choice about whether to confront her with the forensic interview statements in his possession. Defense strategy, and not any procedural or statutory burden, affected whether and to what extent Bista would employ the forensic interview at the preliminary hearing. Bista did, in fact, ask her about some of those forensic interview statements, without referring to the interview directly. Subsequently at trial, after the Commonwealth referred to the forensic interview during closing argument to emphasize consistencies among R.P.'s out-of-court statements and prior testimony, Bista pointed out inconsistent statements in the forensic interview to impeach her credibility. Therefore, given Bista's opportunity to cross-examine R.P. at the preliminary hearing and his ultimate leveraging of inconsistencies before the jury, we find no violation of Bista's Confrontation Clause right.

In sum, Bista has not established that he did not have a prior opportunity to cross-examine R.P. before trial. Although R.P.'s cross-examination at the preliminary hearing

may have been less thorough than Bista might desire, he identifies nothing in the record that rendered the examination constitutionally infirm. *Campos*, 67 Va. App. at 703; *cf. Massey*, 67 Va. App. at 130-31 (finding no Confrontation Clause violation where the defendant had a prior opportunity to cross-examine the victim and introduced later-discovered impeachment materials at trial); *see also California v. Green*, 399 U.S. 149, 170 (1970) (holding that the admission of a victim's preliminary hearing testimony did not violate the Confrontation Clause despite the victim's extensive "lapse of memory").

Accordingly, we affirm the court's admission of R.P.'s forensic interview statements.[15]

CONCLUSION

The court did not err by admitting R.P.'s out-of-court statements under Code § 19.2-268.3 after she had been declared incompetent to testify at trial, and the admission of R.P.'s forensic interview video did not violate Bista's Confrontation Clause right. Therefore, we affirm the court's judgment.

*Affirmed.*

---

[15] We also note that the dissent purports to engage in a "harmless error" analysis of Bista's sodomy conviction, but fails to consider the evidence "in the light most favorable to the Commonwealth," as it is bound to do. *Sullivan v. Commonwealth*, 280 Va. 672, 674 (2010). In finding the evidence insufficient to prove anal penetration, the dissent ignores the fact that during R.P.'s preliminary hearing, she testified four separate times in response to questions on both direct and cross-examination that Bista penetrated her "butt" with his penis. In one answer, she specified that he was "in my butt for longer [than her vagina]." A child's testimony alone is sufficient for the jury to find the elements of the crime proven, and Bista never challenged R.P.'s competency to testify at the preliminary hearing. *See Poole v. Commonwealth*, 73 Va. App. 357, 368 (2021) (holding that a conviction for sexual assault "may be sustained solely upon the uncorroborated testimony of the victim" (quoting *Wilson v. Commonwealth*, 46 Va. App. 73, 87 (2005))). Further, much of the evidence that Bista concedes is sufficient to establish aggravated sexual battery (R.P.'s mother finding R.P. on her knees with her shorts down and Bista kneeling behind her, Bista's admission that he was "just loving her," and Bista's DNA on the inside of R.P.'s underwear) is likewise evidence that supports the anal sodomy conviction.

Humphreys, J., with whom AtLee, J., joins, concurring.

I join entirely in Part I of the majority's well-reasoned analysis and judgment with respect to the application of Code § 19.2 268.3 to the facts of this case and the admission at trial of R.P.'s statements with respect to the Rules of Evidence.[16]

Furthermore, while I find no fault with the analysis of the majority in Part II of its opinion regarding the satisfaction of the Confrontation Clause of the Sixth Amendment, in my view, it is an analysis that we need not engage in given the facts of this case.

As the majority acknowledges, the doctrine of judicial restraint dictates that we decide cases "on the best and narrowest grounds available." *Commonwealth v. Swann*, 290 Va. 194, 196 (2015) (quoting *McGhee v. Commonwealth*, 280 Va. 620, 626 n.4 (2010)). However, a related principle is that of avoiding unnecessarily deciding constitutional issues. *Id.* at 197 (citing *Christopher v. Harbury*, 536 U.S. 403, 417 (2002) (noting the "obligation of the Judicial

---

[16] I also join with the majority in its criticism of our dissenting colleagues for ignoring the required standard of appellate review to view the facts in the light most favorable to the prevailing party below and their use of speculative hindsight to advance arguments and assert facts not in the record.

Moreover, as to the dissent's implication that cross-examination at a preliminary hearing can never satisfy the Confrontation Clause because a preliminary hearing is inherently more limited in its purpose than a trial, I would supplement the majority's response by making a couple of additional points.

Here in the Commonwealth, a preliminary hearing is held for the broad purpose of determining the existence of probable cause that a defendant has committed one or more crimes. It seems to me that where the Rules of Evidence apply in a preliminary hearing as they do here in the Commonwealth, the difference between establishing probable cause and guilt beyond a reasonable doubt regarding the scope of relevant evidence is not so significant as to impair the ability to cross-examine a defendant's accuser(s). I respectfully suggest to my colleagues in the dissent that they would be hard pressed to point to a rule of evidence that would allow an objection to be sustained to a cross-examination question on the basis that it could only be properly asked at trial and not at a preliminary hearing. While I can conceive of situations where a preliminary hearing has not provided a meaningful opportunity for cross-examination regarding charges that are the subject of the preliminary hearing, such as where prior statements of the witness were not provided in discovery to defense counsel prior to the preliminary hearing, that was not the case here.

- 30 -

Branch to avoid deciding constitutional issues needlessly")). Thus, "[g]iven our dual obligations to decide cases on the 'narrowest and best grounds' coupled with that to avoid deciding constitutional issues if possible, . . . the first step in any Confrontation Clause analysis involves determining whether the statements in question are subject to constitutional protection under the Sixth Amendment." *Logan v. Commonwealth*, 72 Va. App. 309, 317 (2020) (en banc) (second alteration in original) (quoting *Cody v. Commonwealth*, 68 Va. App. 638, 657-58 (2018)), *aff'd*, 299 Va. 741 (2021). In this case, I conclude that the Confrontation Clause of the Sixth Amendment was inapplicable to R.P.'s statements made in the forensic interview and therefore see no need to engage in a further constitutional analysis as the majority does.

In 2015, the Supreme Court of the United States decided *Ohio v. Clark*, 576 U.S. 237 (2015), a case which has been largely overlooked here in the Commonwealth. Although summarily dismissed by the dissent, *Clark* represents a significant change in the application of the Sixth Amendment's Confrontation Clause to the out of court statements of children. In *Clark*, the Supreme Court held that "[s]tatements by very young children will rarely, if ever, implicate the Confrontation Clause." *Id.* at 247-48.[17] In reaching that judgment, the Court noted that "young children 'have little understanding of prosecution'" and concluded that "it is extremely unlikely that a 3-year-old child . . . would intend his statements to be a substitute for trial testimony. On the contrary, a young child in these circumstances would simply want the abuse to end, would want to protect other victims, or would have no discernible purpose at all." *Id.* at 248. The Court also noted that statements made to someone who is not principally charged

---

[17] The dissent's analysis of *Clark* would invert this broad holding by suggesting that the phrase "rarely, if ever" actually means that unless statements by very young children are made only to a teacher in the course of an ongoing emergency, they are testimonial.

with uncovering and prosecuting criminal behavior are significantly less likely to be testimonial than statements given to law enforcement officers. *Id.* at 249.

In this case, R.P. was a special needs child with the maturity level of approximately a four year old. Her statements were made to a social worker, not a police officer. In short, as in *Clark*, the record is clear that R.P.'s statements to the social worker were not testimonial as a matter of law and the Confrontation Clause has no application to them. Therefore, we need not take the extra step, as the majority does, to address whether the Sixth Amendment was satisfied.

For these reasons I join in the judgment affirming the circuit court's admission of R.P.'s statements.

Lorish, J., with whom Ortiz, Causey, Friedman, Chaney, Raphael, and Callins, JJ., join dissenting.

Bista had no opportunity to confront his accuser at trial. Instead, he, and the jury, watched a video of the victim speaking to a forensic examiner about the assault for 45 minutes, without cross-examination. The majority finds no constitutional error because the victim testified about the same assault at the preliminary hearing, where Bista was present and had the opportunity to cross-examine her on those *later* statements that the majority deems "substantially similar." But at a preliminary hearing in Virginia, Bista could have used the victim's statements in the forensic interview only to impeach the victim's credibility regarding the testimony she gave at the hearing. In any event, not all of the topics from the forensic interview were discussed at the preliminary hearing and so they were not "substantially similar." For these reasons, I respectfully dissent.

First, I explain the interplay between the state evidentiary rules (relevant here, Code § 19.2-268.3) and the Confrontation Clause.[18] Then, I set out why this Court should accept the trial court's determination that the forensic interview was testimonial. Because the victim was not present at trial and the interview was testimonial, it could be constitutionally admitted at trial only if Bista had a prior opportunity to cross-examine the victim about her statements in the interview. The Confrontation Clause requires such cross-examination to take place at the time the statement was *made*, or at a later hearing where the prior testimonial statement was introduced as substantive evidence. Because neither happened here, I conclude that Bista did not have the opportunity to cross-examine the victim on her statements in the interview.

---

[18] U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."). Bista argues only that his confrontation rights under the federal Constitution were violated, so I do not examine the Virginia Constitution's Confrontation Clause. *See* Va. Const. art. I, § 8.

Finally, I explain why, even adopting the majority's framework, the victim's testimony at the preliminary hearing was not "substantially similar" to the testimonial statements in the forensic interview. Said another way, even assuming the Confrontation Clause is "topic-specific" and not "statement-specific," there were significant "topics" addressed in the forensic interview that did not come up during the preliminary hearing.

I. Most prior child statements are non-testimonial, and therefore may be admissible under Virginia's evidentiary rules without any constitutional bar.

There are two overlapping issues here: admissibility of an out-of-court statement under Virginia's evidentiary rules and admissibility of an out-of-court statement under the federal Constitution's Confrontation Clause. In general, hearsay is inadmissible at trial. Va. R. Evid. 2:802. Code § 19.2-268.3 creates an exception to the hearsay rules for an out-of-court statement of a child under the age of 13, in certain cases and subject to certain requirements. I join in the majority opinion's analysis of Code § 19.2-268.3 and revisit the statute here only to highlight its interaction with the Confrontation Clause.

When a child testifies at trial and the criteria in Code § 19.2-268.3 are met, the prior out-of-court statement "shall not be excluded as hearsay" and is admissible at that trial. Code § 19.2-268.3(B)(2)(a). Both the child's testimony at trial and the prior statement are evidence that the fact-finder may consider. And in this scenario, there is no Confrontation Clause problem because the child is available to testify at trial and can be cross-examined about any prior statement the prosecution introduces as evidence. *Crawford v. Washington*, 541 U.S. 36, 59 n.9 (2004) (when the declarant testifies at trial "the Confrontation Clause places no constraints at all on the use of his prior testimonial statements").

When the child is unavailable to testify at trial, Code § 19.2-268.3 requires more before the prior statement can be admitted. If the trial court concludes there is "corroborative evidence

of the act," then the statement satisfies the statute. Code § 19.2-268.3(B)(2)(b). But whether the statement may be admitted without running afoul of the Confrontation Clause turns on whether the statement is testimonial.[19] It is only the narrow category of *testimonial* statements where the protections of the Confrontation Clause require something beyond the admissibility rules of Code § 19.2-268.3 before a statement may be admitted.

If the statement is testimonial, and the declarant does not testify at trial, the defendant must have had a prior opportunity to cross-examine the testimony or the Confrontation Clause bars its admission at trial. In *Crawford*, the Supreme Court consciously reoriented Confrontation Clause caselaw away from court-assessed "reliability" of out-of-court statements and towards "reliability" as guaranteed by cross-examination. If the witness is not present at trial, "[a]dmitting statements [merely because they are] deemed reliable by a judge is fundamentally at odds with the right of confrontation." *Walker v. Commonwealth*, ___ Va. ___, ___ (June 1, 2023) (second alteration in original) (quoting *Crawford*, 541 U.S. at 61). "To be sure, the Clause's ultimate goal is to ensure reliability of evidence . . . . [But] [i]t commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination." *Crawford*, 541 U.S. at 61. The Confrontation Clause "thus reflects a judgment, not only about the desirability of reliable evidence (a point on which there could be little dissent), but about how reliability can best be determined." *Id.*[20]

---

[19] The Confrontation Clause does not apply to *non-testimonial* statements. *See Davis v. Washington*, 547 U.S. 813, 823-28 (2006).

[20] This distinction explains why I can join in the majority's analysis affirming the trial court's determination that the victim's statements were inherently trustworthy under the statutory criteria for a hearsay exception, but conclude that the Confrontation Clause requires more. As the majority correctly holds, "[c]orroborative evidence need not 'be sufficient to support a verdict' or 'remove[] all doubt,' but only provide 'more strength than was had before.'" *Ante* p. 20 (quoting *Penn v. Manns*, 221 Va. 88, 93 (1980)). But constitutional harmless error review requires more, as I detail below.

Only a few categories of statements qualify as "testimonial."  "A statement qualifies as testimonial if the 'primary purpose' of the statement was to 'create[e] an out-of-court substitute for trial testimony.'"  *Logan v. Commonwealth*, 72 Va. App. 309, 318 (2020) (en banc) (quoting *Michigan v. Bryant*, 562 U.S. 344, 369 (2011)), *aff'd*, 299 Va. 741 (2021).  "Essentially, testimonial statements are those that 'are functionally identical to live, in-court testimony, doing "precisely what a witness does on direct examination."'"  *Id.* (quoting *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 310-11 (2009)).  Prior testimony in a courtroom under oath for any proceeding will always qualify, as will sworn depositions.  *Crawford*, 541 U.S. at 51-52.  In both circumstances, the defendant plainly had an opportunity to cross-examine the witness and the only question for a reviewing court is whether the opportunity was "adequate."

All our prior cases considering the admissibility of a prior testimonial statement considered these types of testimonial statements—where the defendant had the opportunity to cross-examine the witness about a statement at the time it was made.  *See, e.g.*, *Longshore v. Commonwealth*, 260 Va. 3, 4 (2000) (requiring "that the party against whom the prior testimony is offered was present, and represented by counsel, *at the preliminary hearing* and was afforded the opportunity of cross-examination *when the witness testified at the preliminary hearing*" (emphases added)); *Massey v. Commonwealth*, 67 Va. App. 108, 136 (2016) (affirming admission of preliminary hearing transcript at trial when the witness was unavailable because "*at the preliminary hearing . . .*appellant could and did conduct a thorough cross-examination of [the victim]" (emphasis added)).  The same is true in other jurisdictions.  Courts have regularly confronted the admissibility of a deposition, or a preliminary hearing transcript, or prior trial testimony at a later proceeding where the witness was unavailable—and examined whether the

defendant had an adequate (if imperfect) opportunity to contemporaneously cross-examine the statement.[21]

But what about a testimonial statement that was not made in the defendant's presence and subject to contemporaneous cross-examination? Before taking up this question, I address why this Court cannot (on this record) override the trial court's determination that the forensic interview was testimonial.

II. The trial court's determination that the forensic interview was testimonial was not an abuse of discretion.

The trial court made a specific finding below that "[t]he statements made to the social worker [during the forensic interview] are testimonial and they are hearsay." And the Commonwealth conceded the same before trial: "The Commonwealth does concede that the statements made during the forensic interview [are] testimonial." Later, in response to a post-trial motion, the Commonwealth suggested for the first time that the court could alternatively find the statements were not testimonial—a suggestion the court did not take up. The

---

[21] For example, the Supreme Court affirmed the introduction of preliminary hearing testimony at a trial where the declarant was unavailable because the declarant had faced cross-examination at the preliminary hearing. *California v. Green*, 399 U.S. 149 (1970). *See also, e.g.*, *Howard v. State*, 853 N.E.2d 461, 470 (Ind. 2006) (pretrial deposition admissible when child witness declared unavailable at trial because defendant "had a full, fair, and adequate opportunity to confront and cross-examine [the witness] . . . when her pretrial deposition was taken"); *State v. Oscar H.*, 252 A.3d 842, 862 (Conn. App. Ct. 2021) (pretrial deposition of unavailable witness admissible because the deposition "was taken under agreed upon parameters, in court, under oath, subject to penalty of perjury, and with the direct supervision of a judge" and the trial court "did nothing to restrict the defendant's cross-examination of [the witness]"); *State v. Day*, 925 A.2d 962, 981 (R.I. 2007) (when accomplice was unavailable as a witness at state trial, defendant's confrontation rights were not violated when accomplice's testimony from federal trial was admitted in state trial because the federal and state charges arose from the "same sequence of events" and the defendant "not only had ample opportunity to cross-examine [the accomplice during the federal trial], but also . . . had in fact seized that opportunity"); *Commonwealth v. Hurley*, 913 N.E.2d 850, 859 (Mass. 2009) ("Although the cross-examination of [the unavailable witness] at trial (were she alive) may have been different from and better than her cross-examination at the pretrial detention hearing, we conclude the defendant had an adequate opportunity to cross-examine [her] at the prior hearing.").

Commonwealth continues this reversal of course on appeal, asking us to find the trial court was correct to admit the forensic interview but for this different reason.

We can affirm on a different theory than the one the trial court used below only when "the record demonstrates that all evidence necessary to the alternative ground for affirmance was before the circuit court and, if that evidence was conflicting, how [the court] resolved the dispute, or weighed or credited contradicting testimony." *Banks v. Commonwealth*, 280 Va. 612, 618 (2010). Here, the trial court already resolved this dispute and held that the statement was testimonial.

This Court has recognized that under Supreme Court precedent, a trial court determines the "primary purpose of a statement" by considering "whether, in light of *all the circumstances*, viewed objectively, the 'primary purpose' of the [statement] was to 'creat[e] an out-of-court substitute for trial testimony.'" *Logan*, 72 Va. App. at 318-19 (alterations in original) (emphasis added) (quoting *Ohio v. Clark*, 576 U.S. 237, 245 (2015)). My concurring colleagues today reduce the same multi-factor analysis in *Clark* to a single consideration—"[s]tatements by very young children will rarely, if ever, implicate the Confrontation Clause," *ante* p. 22 (quoting *Clark*, 576 U.S. at 247-48)—from which they then create a new per se rule. And they wrap this gratuitous extension of constitutional law in the sheep's clothing of "constitutional avoidance."

Far from looking exclusively to the child's age, the Supreme Court considered many factors in *Clark* to assess whether the primary purpose of a statement was evidentiary, and thus testimonial.

First, the statement was made to "preschool teachers, not the police." *Clark*, 576 U.S. at 246. The Supreme Court, while "declin[ing] to adopt a categorical rule," noted that "such statements are much less likely to be testimonial than statements to law enforcement officers." *Id.*

- 38 -

Next, the statements "occurred in the context of an ongoing emergency" during which "the teachers needed to know whether it was safe to release [the victim] to his guardian at the end of the day." *Id.* "[T]he immediate concern was to protect a vulnerable child who needed help." *Id.* at 247. Thus, the conversation with the preschool teacher resembled the 911 call held non-testimonial in *Davis*, 547 U.S. at 827-28; the purpose of both was to "identify the abuser in order to protect the victim from future attacks." *Clark*, 576 U.S. at 247. And the conversation was "*unlike* the interrogation in *Hammon* [*v. Indiana*, 547 U.S. 813 (2006)] [the companion case to *Davis*], where the police knew the identity of the assailant and questioned the victim after shielding her from potential harm," so the statements made during the interrogation were testimonial. *Id.* (emphasis added); *see Davis*, 547 U.S. at 831-32 (finding the *Hammon* victim's statements were testimonial because she was "telling a story about the past" while being "protected" by police, and her statements were "neither a cry for help nor the provision of information enabling officers immediately to end a threatening situation").

Finally, the Court's inquiry into the purpose of the conversation was not limited to whether the *child* had the purpose of providing evidence at trial, but included whether the *teachers* who interviewed the child "had the primary purpose of assisting" in the defendant's prosecution. *Clark*, 576 U.S. at 240. The Court found that there was "no indication that the primary purpose of the conversation was to gather evidence for Clark's prosecution," but was instead "to protect" the victim. *Id.* at 247. The Court pointed to evidence that the conversation was "informal and spontaneous" and occurred "immediately" after the teachers discovered the injuries "in the informal setting of a preschool lunchroom and classroom." *Id.*

Only after detailing all these considerations did the Supreme Court explain that the victim's age "fortifies" the conclusion that the particular "statements in question" were not

testimonial, observing that "[s]tatements by very young children will rarely, if ever, implicate the Confrontation Clause." *Id.* at 247-48. In *Clark*, the victim was three years old. *Id.* at 240.

In concluding, the Court again emphasized that "[c]ourts must evaluate challenged statements in context, and part of that context is the questioner's identity," and "[i]t is common sense that the relationship between a student and his teacher is very different from that between a citizen and the police." *Id.* at 249. *See also Logan*, 72 Va. App. at 318 (affirming that "courts must consider 'all of the relevant circumstances,' and determine the objective purpose of the statement at the time it was made" (quoting *Bryant*, 562 U.S. at 358, 369)).

Lacking the teacher-child context in *Clark*, the trial court here could have reasonably concluded that the primary purpose of the conversation between the forensic interviewer and the victim was to assist the government in the prosecution. Law enforcement set up the interview.[22] A detective reviewed information contained in the victim's Child Protective Services referral with the interviewer before the interview. During the interview, a detective was watching from another room on a live feed. At one point the interviewer paused the interview and left the room to consult the detective waiting outside, then returned to ask the victim more questions. When the interview occurred, there was no ongoing emergency. The reported abuse had happened six months earlier, Bista did not live with the victim, and law enforcement was already involved and investigating the report. These were all factors for the trial court to weigh in determining the primary purpose of the statements made in the forensic interview.

Even brushing aside these considerations and assuming for a moment that the child's age alone could rule the day, it was for the trial court to weigh the competing evidence and decide

---

[22] In the Commonwealth's own words below: "The forensic interview occurred as a result of law enforcement investigating the matter at hand. Law enforcement was present during the interview . . . in real-time at the interview location."

whether she was like the "very young" child in *Clark*. Here, the victim's *actual* age at the time of the forensic interview was 11 (not 3). She was in seventh grade, with an autism spectrum disorder diagnosis. Her father testified that her "maturity" level was that of a four or five year old. He explained she had "social skills problems," was "distracted easily for anything," and "self-talk[ed] a lot," which he explained meant "talking random stuff." This made her present as "immature for her age." Her learning was at a "second grade level." Balancing this testimony against the other circumstances of the interview is, again, a task for the trial court.[23] The record simply lacks "all evidence necessary" to the concurrence's suggestion that the victim's statements were non-testimonial as an "alternative ground for affirmance." *Banks*, 280 Va. at 618.

III. An out-of-court testimonial statement cannot be cross-examined unless it was introduced as evidence in a hearing or proceeding where the same declarant was subject to cross-examination about the contents of that statement.

This case is the first (anywhere) to resolve "the tricky question that seems not to have [previously] been asked: Does prior cross-examination, or a *prior opportunity to cross-examine*, justify admitting not only the prior *testimony* of the witness, but also prior *statements* by the witness, given at other times?" 4 Christopher Mueller & Laird Kirkpatrick, *Federal Evidence* § 8:28 (4th ed. 2022).

It is undisputed that Bista did not cross-examine the victim during the forensic interview when she made the testimonial statements. And it is undisputed that the victim testified at the

---

[23] The circumstances of the interview would include the trial court's own assessment of the victim's maturity and understanding as expressed in the victim's answers in the interview. *Meade v. Commonwealth*, 74 Va. App. 796, 806 (2022) ("As factfinder, a trial court views video and other evidence to determine what it believes happened; we, on appellate review, view video evidence not to determine what we think happened, but for the limited purpose of determining whether any rational factfinder could have viewed it as the trial court did."). The trial court did consider the "age, maturity, and mental state" of the victim in its determination that her statements were inherently trustworthy and therefore admissible under Code § 19.2-268.3(B).

preliminary hearing, which occurred after the forensic interview, and that her testimony at that hearing was subject to cross-examination. Finally, everyone agrees that the statements from the forensic interview were not affirmed by the victim—let alone introduced as evidence—at the preliminary hearing. The majority concludes the Confrontation Clause was satisfied when the forensic interview was introduced at trial because (1) Bista had the opportunity to *impeach* the victim at the preliminary hearing with statements from her earlier forensic interview and that this satisfied Bista's right to *cross-examine*, and (2) the topics discussed at the preliminary hearing were "substantially similar" to the topics in the forensic interview. I disagree on both counts.

      A. Bista could only have used the forensic interview to impeach the credibility of the victim's preliminary hearing testimony, and that is different than cross-examining the victim about the contents of the prior forensic interview.

The rules of evidence apply to preliminary hearings in Virginia. Code § 19.2-183(B).[24] Those rules allow a party to call into question the credibility of the witness's preliminary hearing testimony through impeachment with a prior statement. *Hall v. Commonwealth*, 233 Va. 369, 374 (1987) ("It is fundamental to the right of cross-examination that a witness who is not a party to the case on trial may be impeached by prior statements made by the witness which are inconsistent with his present testimony . . . ."). However, "[i]mpeaching evidence developed on cross-examination is not offered to prove the substantive elements of the case, but is offered solely to attack the credibility of the witness." Ronald J. Bacigal & Corinna Barrett Lain, *Witnesses—Impeachment and Credibility*, Va. Prac. Crim. Pro. § 17:14 (2022-2023 ed.). Because impeachment is relevant only to credibility, "[p]rior inconsistent statements . . . are inadmissible hearsay if they are offered to prove the truth of their content because they suffer

---

[24] While Virginia applies the rules of evidence to a preliminary hearing, not every jurisdiction does. In federal court, for example, the federal rules of evidence do not apply to preliminary hearings and hearsay can be introduced as substantive evidence. Fed. R. Evid. 1101(d).

- 42 -

from all of the usual disabilities of hearsay." *Hall*, 233 Va. at 374; *see* Va. R. Evid. 2:801(d)(1), 2:802.

So the witness's *in-court testimony* could be impeached by a prior inconsistent statement, diminishing the witness's credibility. Or, having been impeached, a prior consistent statement could bolster the credibility of the witness's *in-court testimony*.[25] But in neither circumstance would that prior out-of-court statement be admissible for the truth of the content of that statement.

Thus, absent admission of the out-of-court statement as evidence in a court proceeding, a testifying witness cannot be "cross-examined" on that statement at that proceeding. By definition, cross-examination is the act of questioning a witness about the testimony elicited on direct. 1 *The Law of Evidence in Virginia* § 11-9 (2022) ("Virginia follows the majority of states in limiting the scope of cross-examination to matters elicited during the examination in chief."). A defendant cannot "cross-examine" a witness about testimony that was never introduced.[26]

---

[25] Our Supreme Court has long held that "'the repetition of a story does not render it any more trustworthy[,]' [and] [f]or that reason, there is a general rule excluding the prior consistent statements of a witness that are offered for the purpose of buttressing his testimony at trial." *Anderson v. Commonwealth*, 282 Va. 457, 463-64 (2011) (quoting *Scott v. Moon*, 143 Va. 425, 434 (1925)). But "prior consistent statements made by the witness are admissible to support the witness" after "the opposing party has attempted to impeach the witness." *Id.* at 464. Like a prior inconsistent statement, a prior consistent statement "may be considered by the fact-finder only for the fact of its utterance, *not for the truth of its content*." *Id.* at 465 (emphasis added); *see* Va. R. Evid. 2:801(d)(2).

[26] Other jurisdictions and jurists have affirmed that the Confrontation Clause requires more than the general opportunity to cross-examine and that the prosecution must elicit the statements sought to be admitted at trial so that the defendant has the opportunity to cross-examine the witness about those statements. *See State v. Blue*, 717 N.W.2d 558, 566 (N.D. 2006) ("A witness's mere appearance at a preliminary hearing is not an adequate opportunity for cross-examination for purposes under the Confrontation Clause."); *In re Personal Restraint of Grasso*, 84 P.3d 859, 868 (Wash. 2004) (en banc) (finding that the admission of a child victim's hearsay statements did not violate the Confrontation Clause because the defendant "enjoyed the opportunity for full cross-examination about the alleged events *and* about [the] statements" (emphasis added)); *State v. Noah*, 162 P.3d 799, 807 (Kan. 2007) (Davis, J., concurring)

Sometimes an out-of-court statement may be admitted as substantive evidence at trial. When that occurs, and the witness is present at trial to be cross-examined about the statement, the Confrontation Clause is satisfied. *California v. Green*, 399 U.S. 149, 154, 159 (1970) (upholding constitutionality of California statute that allowed a past statement to "be introduced at trial without violating hearsay rules of evidence"). This form of deferred cross-examination passes constitutional muster because the witness "must now affirm, deny, or qualify" his prior statement under penalty of perjury. *Id.* at 159. Therefore, cross-examination at trial about a prior out-of-court statement introduced as evidence can be "full and effective."[27] *Id.* Not so for a preliminary hearing in Virginia.

What is more, a preliminary hearing, as we have repeatedly held, is not a vehicle for discovery but is for the sole purpose of finding probable cause. "Probable cause is assessed in preliminary hearings in Virginia criminal cases 'essentially [as] a screening process.'" *Commonwealth v. Jackson*, 276 Va. 184, 191 (2008) (alteration in original) (quoting *Moore v.*

---

("Because I find that the requirements of unavailability and opportunity for cross-examination discussed in *Crawford* and *Davis* relate to the *statement* sought to be admitted at trial, not generally to the declarant who made that statement, I would hold that even a full cross-examination at some point previously in the proceedings would not allow a court to admit the victim's statements by way of other witness' testimony if the State did not first establish that *such statements had been subjected to cross-examination by offering into evidence the previous transcript*." (second emphasis added)); *State v. Rohrich*, 939 P.2d 697, 700-01 (Wash. 1997) (en banc) ("The opportunity to cross examine means more than affording the defendant the opportunity to hail the witness to court for examination. It requires the State *to elicit the damaging testimony* from the witness so the defendant may cross examine if he so chooses." (emphasis added)).

[27] Other jurisdictions have affirmed that a forensic interview may be introduced at trial when the witness testifies at trial and can be cross-examined about the interview. *See, e.g.*, *Marquis v. State*, 242 So. 3d 86, 90 (Miss. 2018) ("[T]he admission of the recording did not violate the Confrontation Clause of the Sixth Amendment, because Marquis had the opportunity to, and did, cross-examine J.D. at trial."); *State v. Poulor*, 932 N.W.2d 534, 538 (N.D. 2019) (affirming that introduction of complainant's video-recorded statement did not violate the Confrontation Clause because the complainant was available and testified at trial).

*Commonwealth*, 218 Va. 388, 391 (1977)); Code § 19.2-183. "[A]s soon as may be practical,"

Code § 19.2-183(A), the circuit court must determine "whether there is reasonable ground to

believe that the crime has been committed and whether the accused is the person who committed

it," *Moore*, 218 Va. at 391. Criminal defendants cannot expand the limited scope of a

preliminary hearing and turn it into a vehicle for discovery. *See, e.g.*, *Williams v.

Commonwealth*, 208 Va. 724, 729 (1968) (a defendant has no "right to call witnesses at the

preliminary hearing for the purpose of discovery"); *Davis v. Commonwealth*, 215 Va. 816, 821

(1975) ("Manifestly, no statute or Rule of Court affords the accused a Right to use the

preliminary hearing as a discovery vehicle."). There is "no reason for the judge to hear further

evidence against the accused" after the Commonwealth has established reasonable grounds to

believe a felony has been committed. *Williams*, 208 Va. at 728.

Because the rules of evidence apply to preliminary hearings in Virginia, Bista could have

(and did) cross-examine the victim on her preliminary hearing testimony, and he could have (but

did not) try to undermine the victim's credibility by impeaching her with statements from her

prior forensic interview. That Bista's counsel asked a few questions informed by reviewing that

interview does not override the rules of evidence. The issue is not (as the majority suggests)

whether Bista was prohibited from conducting a "more thorough cross-examination" of the

victim's *preliminary hearing testimony*, or whether any failure to engage in more thorough cross-

examination was "strategic." Bista simply could not cross-examine the victim about the contents

of a prior statement that was never introduced as substantive evidence.[28]

---

[28] Under the rules of evidence, Bista could not have admitted the statement as substantive evidence at the preliminary hearing. That aside, the burden would have been on the Commonwealth (not Bista) to try to introduce the statement and establish why it was admissible as evidence. *See Jackson*, 276 Va. at 193 (recognizing the Commonwealth bears the burden to present evidence to prove probable cause in preliminary hearing in a criminal case); *Melendez-Diaz*, 557 U.S. at 324 (the State bears the burden of presenting its witnesses).

The majority's contrary decision will not only erode defendants' confrontation rights, but it will also result in more—and longer—preliminary hearings. By suggesting the opportunity to cross-examine is satisfied because Bista could have asked more questions at the preliminary hearing but made a "strategic choice" not to, a defendant who waives a preliminary hearing may do so at his peril. After all, that defendant also had the "opportunity" to have a preliminary hearing where he "could" have cross-examined the victim about, impeached the victim with, or asked questions informed by, a prior statement. Assuming a court allows a defendant to exceed the limited purpose of a preliminary hearing, in contravention of our caselaw, a defendant will now need to address every potential out-of-court testimonial statement the Commonwealth might introduce to mitigate the risk that a witness is later found unavailable to testify at trial—turning preliminary hearings into mini-trials. Moreover, prosecutors who harbor doubts about a witness's competence may now be motivated to have the witness testify at a preliminary hearing and strategically *not* ask about any prior out-of-court statements.

Ultimately, the analysis undertaken by my colleagues in the majority—concluding that the general opportunity to cross-examine a later-unavailable witness at some point is enough, so long as the testimony was substantially similar—ends up as no more than a judicial determination that the prior out-of-court statement was reliable enough. In other words, the very process of "[a]dmitting statements deemed reliable by a judge" that *Crawford* rejected as "fundamentally at odds with the right of confrontation," before enshrining a superior procedural protection—the cross-examination of the actual *statement*. 541 U.S. at 61.

B. Even if the opportunity to cross-examine should be understood as "topic specific" and not "statement specific," significant testimony from the forensic interview was not introduced during the preliminary hearing.

Because this is an issue of first impression, other courts have not yet decided whether prior testimonial statements that the defendant could not contemporaneously cross-examine

should be per se inadmissible or evaluated case-by-case. Even assuming a case-by-case approach is appropriate, the forensic interview here should have been excluded because it covered a number of incriminating subjects not raised by the prosecution at the preliminary hearing, thus denying Bista's confrontation rights. To apply the majority's test and determine whether the testimony from the preliminary hearing was "substantially similar" to the testimony from the forensic interview, such that cross-examination of one can stand in for cross-examination of the other, I cannot gloss over the horrific details of the assault as the victim described it. *See Breeden v. Commonwealth*, 43 Va. App. 169, 187 (2004) ("[T]he fact of the complaint of rape lay in the details of [the victim's] statement."); *Mitchell v. Commonwealth*, 25 Va. App. 81, 86 (1997) ("The details of the victim's complaint were elements of the offense. Without those details, the complaint would have been incomplete."). Thus, I will point out three significant aspects of the forensic interview that were absent from the preliminary hearing.

First, during the forensic interview, the victim testified that the assault started when "my grandpa forced me to kiss him." She demonstrated what the kiss looked like, showing the interviewer that Bista put his hand behind her "neck, then shoved" her head in and kissed her. She said Bista told her to "pucker her lips," and she explained that the kiss was "gross" and the grossest part was that "he made me do it deeper, which is so disgusting" and she could "taste his breath." She told the examiner that "[h]is tongue" went in her mouth and "after that I was very . . . so dizzy I was really mad." The victim told him to stop kissing her but "he kept on doing" and "[h]is tongue started to make me start to make me tingle my head" and "I couldn't stop tingling." She said this whole time "[h]is hands were in my neck . . . so tight that I'm looks like I'm dying." While this was going on, she tried to run away but he pulled her shirt and she "fell down" and he "keep dragging my shirt like 20 times . . . like 9-10 times and then I keep bumping my head" and "landed on my back."

The Commonwealth specifically highlighted this part of the video in its closing argument, arguing to the jury that the victim's account was credible and not something she would make up:

> You hear it on minute 28, 58 seconds where she's describing, "He told me to pucker up, kiss. I told him, 'What are you doing?' He wouldn't listen." Again go to minute 31, three seconds where she's describing how gross this kissing is. "He made me do it deeper. It was disgusting. I could taste his breath. I was really mad. I told him to stop, 'What's wrong with you?' His tongue, it started to make me tingle in my head."

In closing, the Commonwealth also referred the jury to "Minute 33, 51, 'I couldn't stand. I tried to stand away from him, he kept dragging me, my shirt like ten--20 times, like nine to ten times bumping my head and landing it back."

At the preliminary hearing, in contrast, the victim never mentioned kissing at all. Nor did she testify that she had been dragged repeatedly, bumping her head. Instead, she said the assault began when Bista came into the room she was in and "just touched my private parts without taking my shorts off." On cross-examination of her preliminary hearing testimony, she said Bista was "holding on to my shoulder" and "dragging" her and "wanted me to stay in the living room for like two hours, but I have to go to bed."

Second, the victim told the forensic interviewer an elaborate story about Bista trying "to take a video of the private parts" with a "flip phone that could record videos" and that she saw the "phone on his hand" and "checked that he was recording." She explained she had "looked at his phone and figured out that he was recording" and saw "private parts" and "her butt" and "in that recording, her pants were down." The victim recounted that the "flip phone" was a "black" "Nokia" with a screen.

During her testimony on direct at the preliminary hearing, however, the victim did not mention any phone. On cross-examination, Bista's counsel asked whether Bista had a phone or

took any videos of her, and the victim simply said no.[29]  Any other questions about the specifics of the victim's prior testimony and why she provided such a detailed description of seeing a video on a phone that never existed would have plainly been outside the scope of direct examination.

Third, the victim's testimony during the forensic interview evolved over the course of that interview.  There was no discussion of this at the preliminary hearing (nor could there have been without the ability for either party to introduce the interview statements for the truth they asserted).  Bista was never able to cross-examine the victim about the possibility that the forensic interviewer may have (unintentionally) led her into changing her testimony.[30]

The initial story the victim told the forensic interviewer was that Bista started kissing her and ultimately "tried" to touch her private parts and then licked her private parts.  The victim also described Bista touching her under her clothing.  Then her mom walked in on them, ending the assault.  The victim was clear that Bista had all of his clothing on during the assault—"the pants, the shirt, the hats, everything."

After this first description, the forensic interviewer prompted the victim with, "Did something happen with his private parts?" and the victim said yes, he was "trying" and "wanting" to put his parts inside her front and back.  The interviewer then said, "I know you said that he put his private part in your butt.  And where were his clothes when he did that?"  And the victim responded, "His pants were a bit down."

---

[29] While this question was no doubt *informed* by the forensic interview, an informed question does not transform cross-examination of one testimonial statement into cross-examination of another prior testimonial statement.

[30] Neither the majority nor the concurrence contest that the victim's story changed during the interview, yet they dismiss this point as "speculative."  If Bista had the *actual* opportunity to cross-examine the victim on the forensic interview statements, there would be no need to "speculate" as to what he *may* have cross-examined the victim about.

There is an art to a forensic interview of a child and drawing out information that a child may be reluctant to share or too traumatized to initially remember. *See* Chris Newlin et al., *Child Forensic Interviewing: Best Practices*, U.S. Dep't of Just. Off. of Juv. Just. & Delinq. Prevention, at 3-10 (Sept. 2015).[31] Children often do not tell stories in linear ways. *Id.* at 4-5. But the victim was simply never "test[ed] in the crucible of cross-examination," *Crawford*, 541 U.S. at 61, about whether the first version of her story was correct, or why she left out certain details the first time.[32]

These three examples highlight how the 45-minute excerpt of the interview the jury watched is not reducible to a single "topic" or a few overlapping areas of testimony. This is shown most obviously by the way the Commonwealth urged the jury to "absolutely judge this victim's disposition by that forensic interview and her testimony . . . . This 11 year old with her disposition as shown in that interview did not make this up. She doesn't know how to make this up. She doesn't and she didn't."

The simplest explanation is likely the best: if the victim's forensic interview was truly "substantially similar" to her testimony at the preliminary hearing, the Commonwealth would not have needed to introduce it in the first place, or repeatedly reference it during closing (more than ten times). Explaining why it would be problematic for a court to reach the very conclusion the majority endorses today, Professors Mueller and Kirkpatrick observe that even if "the defense did have a chance to cross-examine the victim on what actually happened [at a preliminary hearing], and to test her memory, perception, and candor in describing the acts, events, and conditions in issue," the out-of-court prior statement offered at trial "is certain to differ in some

---

[31] Available at https://ojjdp.ojp.gov/sites/g/files/xyckuh176/files/pubs/248749.pdf.

[32] As discussed below, while the first version of her story supports the aggravated sexual battery charge, only the second version supports the sodomy count.

significant ways from the preliminary hearing testimony—otherwise why would a prosecutor offer it?" *See* Mueller & Kirkpatrick, *supra* § 8:28.[33]

IV. The Confrontation Clause error was not harmless as to the sodomy charge.

Because I find constitutional error, I must briefly address whether the error is harmless. Bista was convicted of two charges: one for aggravated sexual battery, and one for sodomy by anal penetration.[34] To assess whether a constitutional error was harmless, we ask whether "absent the [constitutional error], is it clear beyond a reasonable doubt that the [factfinder] would have returned a verdict of guilty?" *Commonwealth v. White*, 293 Va. 411, 421 (2017) (alterations in original) (quoting *United States v. Hasting*, 461 U.S. 499, 510-11 (1983)). In other words, we ask "whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction." *Id.* at 420-21 (quoting *Chapman v. California*, 386

---

[33] The treatise also suggests that the majority's framing of the Confrontation Clause as topic-specific, rather than statement-specific, is wrong. "If the statement *also was not* offered at the preliminary hearing, the defense had no chance to test *the statement itself*, to probe the details that it relates, or to challenge the speaker about the statement in any way." Mueller & Kirkpatrick, *supra* § 8:28. Indeed, "[w]hatever headway the defense might make in attacking the witness on her memory or accuracy in describing the events is a pale substitute for cross-examination that challenges the witness on the particular statement being offered in evidence." *Id.*; *see also* 2 Barbara E. Bergman et al., *Wharton's Criminal Evidence* § 6:10.30 (15th ed. 2021) (explaining that "[e]ven if the prosecution puts a witness on the stand, it may not introduce his prior testimonial statements if it does not at least first ask the witness to relay the substance of the statements in court" because "[t]he Confrontation Clause 'requires the State to elicit damaging testimony from the witness so the defendant may cross examine if he so chooses'" (quoting *Rohrich*, 939 P.2d at 701)).

[34] While forcible sodomy under Code § 18.2-67.1 could include other acts, such as cunnilingus, the indictment here specified only "anal intercourse," and the jury was instructed that anal intercourse was an element of the crime of forcible sodomy.

U.S. 18, 23 (1967)). "This standard is not the same thing as simply asking 'whether the legally admitted evidence was sufficient' to support the conviction." *Id.* at 422.[35]

Considering the evidence of aggravated sexual battery in the light most favorable to the Commonwealth, there was significant evidence of this offense besides the forensic interview— Bista's confession to the victim's mother that he had "licked" the victim's "private part" would have been sufficient on its own.[36] Other evidence supports this particular offense: the victim's testimony at the preliminary hearing, trial testimony from the victim's mother who walked into a room where she saw her daughter's shorts drawn below her knees and Bista kneeling behind her, and forensic testing which could not eliminate Bista as a contributor to non-semen DNA found in the interior crotch of the victim's underwear. Therefore, I would find the error harmless as to the count of aggravated sexual battery.

The specific evidence of anal penetration necessary to support the sodomy conviction, however, was comparatively sparse. In its briefing on appeal, the Commonwealth points only to the victim's testimony at the preliminary hearing and her forensic interview as evidence of the

---

[35] The majority characterizes the dissent as finding the evidence "insufficient to prove anal penetration." But, as required for constitutional error, I do not address whether "a rational jury *could have* found the defendant guilty," but rather whether it is clear "'beyond a reasonable doubt that a rational [factfinder] *would have* found the defendant guilty'" absent the inadmissible evidence. *White*, 293 Va. at 422 (alteration in original) (quoting *Neder v. United States*, 527 U.S. 1, 18 (1999)).

[36] Under Code § 18.2-67.3, aggravated sexual battery requires that the defendant sexually abuse the victim and, as relevant here, that the victim is under 13. "Sexual abuse" includes an "act committed with the intent to sexually molest, arouse, or gratify any person, where . . . [t]he accused intentionally touches the complaining witness's intimate parts or material directly covering such intimate parts." Code § 18.2-67.10(6)(a).

sodomy.  The first time the victim alleged anal penetration was during the forensic interview.[37]

She then testified to the same during the preliminary hearing.  And her parents testified at trial

that the victim told them at some point that Bista "put it on the front and *tried* to put it on the

back."  (Emphasis added).

While I view this evidence in the light most favorable to the Commonwealth, I cannot

ignore the trial court's finding that the victim's mother "had some influence" on the victim's

memory of "whether she was sodomized."  I also cannot ignore the Commonwealth's heavy

reliance on the forensic interview during closing argument to corroborate the victim's

preliminary hearing testimony.[38]  Thus, I cannot say it is clear *beyond a reasonable doubt* that

---

[37] During the hearing on whether to permit the victim's statements under Code § 19.2-268.3, the victim's mother initially testified that the victim immediately disclosed to her "that he took his private part in my front and back both sides.  He entered it."  But the mother later clarified that the daughter immediately alleged only vaginal penetration.  When both parents were interviewed by law enforcement, neither said, at that time, that the victim had disclosed anal penetration.

[38] While the majority is correct that a conviction for sexual assault "may be sustained solely upon the uncorroborated testimony of the victim," *see Wilson v. Commonwealth*, 46 Va. App. 73, 87 (2005), my colleagues identify no case where a sexual assault conviction was sustained solely on a victim's testimony at a preliminary hearing and the victim was found incompetent to testify at trial because she did not have the "capacity to comprehend the legal significance of an oath," "distinguish truth from a falsehood," or "understand the questions propounded and make intelligent answers."  I agree that the other evidence the majority highlights (the mother finding the victim on her knees with her shorts down and Bista kneeling behind her, his statements, and the presence of his non-semen DNA inside the victim's underwear) provides some measure of additional "strength" to the victim's overall allegations— such that the trial court did not err in introducing her statements under Code § 19.2-268.3 as discussed above.  *See Penn*, 221 Va. at 93 (outside of harmless error review, merely corroborative evidence need not "be sufficient to support a verdict" or "remove[] all doubt," and instead must only provide "more strength than was had before" (quoting *Brooks v. Worthington*, 206 Va. 352, 357 (1965))).  But it is not clear "beyond a reasonable doubt that the [factfinder] *would have* returned a verdict of guilty," and to the contrary, "there is a reasonable possibility that the evidence complained of might have contributed to the conviction."  *White*, 293 Va. at 420-21 (alteration in original) (first quoting *Hasting*, 461 U.S. at 511; and then quoting *Chapman*, 386 U.S. at 23).

the jury would have still returned a verdict of guilty without watching 45 minutes of the victim speaking to the forensic interviewer.[39]

## V. Conclusion

That a child would be sexually assaulted is every parent's worst nightmare. That it was a family friend—known to the child as "grandpa"—who committed the assault, is unimaginable. But in the face of bad facts, we should resist the temptation to make bad law. For the reasons set forth above, I would affirm Bista's conviction for aggravated sexual battery. But I would reverse Bista's conviction for forcible sodomy and remand for a new trial, because the Confrontation Clause requires more.

---

[39] The Supreme Court of Montana similarly concluded both that the admission of a forensic interview at trial violated a defendant's Confrontation Clause rights because the defendant had no opportunity to cross-examine the witness about the statements in the interview and that introduction of the video was not harmless. *State v. Tome*, 495 P.3d 54 (Mont. 2021). "The jury heard from [the victim's] own lips how Tome had abused her, they saw her gestures, they observed her demeanor, and the video was a powerful presentation of the State's complaining witness—a witness who was out-of-reach and unavailable for cross-examination," and therefore, the introduction of this out-of-court statement was not harmless. *Id.* at 67.

PUBLISHED

# *VIRGINIA:*

*In the Court of Appeals of Virginia on* **Tuesday** *the* **10th** *day of* **January, 2023**.

Dilliraj Bista,                                                                                          Appellant,

against          Record No. 0904-21-4
                 Circuit Court No. FE-2019-716

Commonwealth of Virginia,                                                               Appellee.

Upon a Petition for Rehearing En Banc

Before Chief Judge Decker, Judges Humphreys, Beales, Huff, O'Brien, AtLee, Malveaux, Athey, Fulton, Ortiz, Causey, Friedman, Chaney, Raphael, Lorish, Callins and White

On December 19, 2022 came the appellant, by court-appointed counsel, and filed a petition requesting that the Court set aside the judgment rendered herein on December 6, 2022, and grant a rehearing *en banc* on the issue(s) raised in the petition.

On consideration whereof and pursuant to Rule 5A:35 of the Rules of the Supreme Court of Virginia, the petition for rehearing *en banc* is granted and the appeal of those issues is reinstated on the docket of this Court. The mandate previously entered herein is stayed pending the decision of the Court *en banc*.

The parties shall file briefs in compliance with the schedule set forth in Rule 5A:35(b). The appellant shall attach as an addendum to the opening brief upon rehearing *en banc* a copy of the opinion previously rendered by the Court in this matter. An electronic version of each brief shall be filed with the Court and served on opposing counsel.[1]

A Copy,

Teste:

A. John Vollino, Clerk

*original order signed by a deputy clerk of the*
By:     *Court of Appeals of Virginia at the direction*
        *of the Court*
                 Deputy Clerk

---

[1] The guidelines for filing electronic briefs and appendices can be found at www.courts.state.va.us/online/vaces/resources/guidelines.pdf.

Present:    Judges O'Brien, Lorish and Senior Judge Annunziata
Argued at Alexandria, Virginia


DILLIRAJ BISTA

v.        Record No. 0904-21-4

COMMONWEALTH OF VIRGINIA

OPINION BY
JUDGE ROSEMARIE ANNUNZIATA
DECEMBER 6, 2022


FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
Stephen C. Shannon, Judge

Dawn M. Butorac, Public Defender, for appellant.

Katherine Quinlan Adelfio, Assistant Attorney General (Jason S.
Miyares, Attorney General, on brief), for appellee.


A jury convicted Dilliraj Bista of sodomy of a child under the age of thirteen years by a

person eighteen years of age or older and aggravated sexual battery, in violation of Code

§§ 18.2-67.1 and 18.2-67.3, respectively.[1]  Consistent with the jury's verdict, the trial court

sentenced Bista to life plus twenty years' incarceration.  Bista challenges his convictions on

several grounds.  First, Bista argues that the trial court erroneously admitted the child's

out-of-court statements under Code § 19.2-268.3.  As a matter of first impression, we must

decide whether that statute conditions admissibility on the declarant's competency to testify.  We

hold that it does not.  Bista also argues that the trial court's admission of a video depicting the

child's forensic interview violated his right to confrontation under the Sixth Amendment of the

United States Constitution.  Next, Bista contends that the trial court erroneously rejected two

---

[1] The jury acquitted Bista of a related charge of rape of a child under the age of thirteen
years by a person eighteen years of age or older.

proffered jury instructions. Finally, he argues that the trial court improperly limited the scope of

his closing argument. For the following reasons, we affirm the trial court's judgment.

BACKGROUND

On appeal, we review the evidence "in the 'light most favorable' to the Commonwealth,

the prevailing party in the trial court." *Hammer v. Commonwealth*, 74 Va. App. 225, 231 (2022)

(quoting *Commonwealth v. Cady*, 300 Va. 325, 329 (2021)). Doing so requires us to "discard the

evidence of the accused in conflict with that of the Commonwealth, and regard as true all the

credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom."

*Cady*, 300 Va. at 329 (quoting *Commonwealth v. Perkins*, 295 Va. 323, 324 (2018)).

In August 2018, R.P. was eleven years old and living with her younger brother and

parents, Hem and Rita. R.P. suffers from autism spectrum disorder, which impairs her

socialization, memory, and ability to learn and communicate. Hem and Rita had immigrated

from Nepal and formed a close relationship with Bista and his family, who were also Nepali.

R.P. referred to Bista as "grandpa" and communicated with him through gestures and basic

English and Nepali phrases.

On August 17, 2018, Bista had been staying at R.P.'s home for several days while his

wife visited Nepal. That evening, Hem prepared dinner in the kitchen with his parents while

Bista smoked a cigarette outside on the "back deck." R.P. and her brother were alone in a living

room on the opposite side of the house. Around 8:30 p.m., Rita went upstairs to shower and

when she returned downstairs at 8:45 p.m., she found Bista kneeling behind R.P. on the living

room floor. R.P. was on her hands and knees in a "dog position" with her underwear and shorts

pulled down. Rita screamed and took R.P. upstairs to question her with Hem. R.P. told her

parents that Bista had "licked [her] on the front and back" and "put it on the front and tried to put

it on the back." Rita removed R.P.'s clothing and placed it inside a plastic grocery bag, tying the

- 2 -

bag closed.  Bista initially denied any wrongdoing, assuring Rita and Hem that he had been "playing" with R.P., but he later admitted to them that he had "licked [her] private part."  R.P.'s parents did not report the incident to police, fearing that disclosure would harm their family's prestige in the Nepali community.  Bista moved to Hawaii the following week.

On January 29, 2019, R.P. told her special education teacher, Brian Rothe, that "the previous summer in August" she had been "raped by a family friend" who "looked like a grandpa."  She told Rothe that the man had "gone back to Nepal" after her mother caught him "touching [her] inappropriately" and had "kicked him out of the house."  Rothe notified R.P.'s parents, and Child Protective Services (CPS) was notified of the allegations.  The next day, CPS contacted Fairfax County Detective Thomas Gadell, Jr., to investigate.

At Gadell's request, Maria Bonilla conducted a video-recorded forensic interview of R.P. at SafeSpot Children's Advocacy Center.[2]  Describing the incident, R.P. told Bonilla that "Grandpa Bista" and his family had visited her home for a "dinner party."  Bista found R.P. alone in the living room and forcefully kissed her by grabbing her neck.  R.P. said she tried to run away but Bista pulled her shirt "nine or ten times," causing her to fall.  Bista forced R.P. into a "dog" position and removed her shorts.  Pointing to her groin, R.P. explained that Bista's "mouth was going crazy" as he kneeled behind her and attempted to "lick" her "private part."  R.P. also said that Bista's penis "tr[ied] to go in her butt."  She stated that Bista had used his

---

[2] Michelle Thames, the executive director of SafeSpot, testified at a pretrial hearing that a "forensic interview" is a special interview "conducted in [a] neutral setting by a trained professional forensic interviewer" when "a child makes an allegation of child abuse."  SafeSpot accepts "referrals" to conduct such interviews exclusively from "law enforcement and [CPS]."
Detective Gadell arranged the interview.  He provided details of the suspected abuse to Bonilla before she conducted the interview.  Gadell watched the interview on a "closed circuit television" in an adjacent room and Bonilla conferred with him to "make sure [he] didn't have any additional questions" before concluding the interview.

"flip phone" during the assault to video record her "butt" and "private parts," but someone had since deleted the videos and the phone was "lost."

Police collected the grocery bag containing R.P.'s clothing worn during the assault. After Bista's arrest and extradition from Hawaii, Gadell interviewed him[3] and obtained a buccal swab of his DNA. Police also obtained buccal swabs of R.P.'s and Hem's DNA. Subsequent DNA testing established that Bista could not be eliminated as a contributor to a DNA mixture discovered in the "interior crotch" of R.P.'s underpants. In June 2019, a forensic nurse conducted a "wellness exam" and concluded that R.P. had "no injuries" to her vagina or anus.

Material Proceedings Below

A. Preliminary Hearing and Indictment

On September 5, 2019, R.P. testified[4] at a preliminary hearing that Bista's wife drove him to her home before the incident. R.P. stated that Bista initially "just touched [her] private parts without taking [her] shorts off." Bista then removed his pants and exposed his "penis" before inserting it into R.P.'s vagina and "butt." For the next "forty minutes," Bista kept "doing these stuff over and over again," although R.P. "yelled at [Bista]" and "tried to leave the room several times."

During cross-examination, R.P. testified that Bista *did not* "pull [her] shirt" during the assault, but he "prevented [her] from leaving" the room by "blocking" the entrance. Bista also "left his phone in [a] bag" during the assault and contrary to earlier statements she made during the forensic interview, he did not use it to photograph or record her.[5] R.P. explained that she

---

[3] The trial court ruled that Bista's interview statements were inadmissible at trial.

[4] Bista did not challenge R.P.'s competency to testify at the preliminary hearing.

[5] The record reflects that on August 15, 2019, the Commonwealth provided a copy of the forensic interview video to Bista's trial counsel.

learned the terms "penis," "vagina," and "sex" through online research as a nine-year-old, and since she was "8 to 10 years old," R.P. had watched videos of "people having sex" on the website "Pornhub."

The district court certified the charges to the grand jury, which subsequently indicted Bista for sodomy of a child under the age of thirteen years and aggravated sexual battery. The Commonwealth also directly indicted Bista for rape.[6]

### B. Hearing on Motion to Admit Statements under Code § 19.2-268.3

Before trial, the Commonwealth moved the trial court to admit R.P.'s out-of-court disclosures to her parents, teacher, and Bonilla under Code § 19.2-268.3, which makes admissible certain hearsay statements of child victims of specified crimes. Following briefing by counsel, the trial court conducted an evidentiary hearing at which Rita testified that she saw Bista kneeling "very close" behind R.P., whose shorts were "below her knees." When questioned, R.P. told Rita that Bista "tried to put his organ inside [her] front and back" and "licked" her "private parts." Rita denied that R.P. had ever watched internet pornography and maintained that R.P. "never lies." She explained that R.P. was "mildly autistic" and had the "mental" age of a "four to five-year-old child."

Hem testified that immediately after the incident, R.P. said that Bista had "put his private part into [her] private part" and "licked it." Hem also denied that R.P. had ever lied, explaining that she suffered from cognitive deficits and could not distinguish "what is bad and what is good" because of her autism.

Rothe could not "remember exactly" whether R.P. had reported that her attacker had "attempted" or "actually accomplished" the alleged acts of sexual abuse. He also did not recall

---

[6] The Commonwealth later amended the sodomy and rape indictments to include language specifying that Bista was over the age of eighteen years during the offenses.

R.P. "saying anything about being licked."  R.P. required an IEP[7] at school because of her

autism.  In Rothe's experience, she engaged in "attention-seeking behavior" at school—

including "randomly" telling stories and striking "promiscuous poses"—but, to his knowledge,

she had never fabricated an allegation of sexual abuse.

Bonilla was no longer employed at SafeSpot, but Michelle Thames, SafeSpot's executive

director, authenticated the video from R.P.'s forensic interview; Thames also confirmed that

Bonilla had followed "appropriate interview techniques."[8]

The trial court considered the factors enumerated in Code § 19.2-268.3 and found that, as

the victim, R.P. had "personal knowledge of the event."  In addition, "extrinsic evidence"

established Bista's "opportunity to commit the act," including Rita's personal observations of

"physical interactions" that were "consistent with [R.P.]'s statement."  The trial court found no

motive for R.P. or her parents to fabricate the accusations, and it found Rothe, Rita, and Hem's

testimony credible.  Finally, the trial court found that R.P. provided "a very detailed recollection

of the event," despite "some inconsistencies" and being "mildly autistic."  Thus, the trial court

concluded that "sufficient indicia of reliability" rendered her statements "inherently trustworthy"

and therefore admissible under Code § 19.2-268.3.[9]

---

[7] According to Rothe's testimony, an "IEP" is an "Individualized Education Program" designed to accommodate the specialized needs of children with "learning" or "emotional" disabilities.

[8] The trial court reviewed the video of R.P.'s forensic interview, which the Commonwealth introduced as an exhibit during the hearing.

[9] The trial court ruled that the video of the forensic interview was inadmissible to the extent it contained statements irrelevant to "the purported acts directed against [R.P.]." Accordingly, the trial court ordered the Commonwealth to redact those portions of the video.

C. Hearing on Victim's Competency and Bista's Motion to Exclude Forensic Interview Video

Bista then moved to exclude the video of R.P.'s forensic interview from trial under the Sixth Amendment's Confrontation Clause. Bista also requested an evidentiary hearing to determine R.P.'s competency to testify. Following additional briefing by counsel,[10] the trial court conducted another evidentiary hearing.

Detective Gadell testified that at a pre-hearing meeting with the prosecutor, R.P. had disclosed that some of her preliminary hearing testimony was false. R.P. said that Bista's wife had been "on vacation" during the incident and it was untrue that R.P. watched internet pornography. Hem testified regarding the meeting and denied that R.P. had intentionally lied. Rather, R.P.'s autism diminished her capacity to answer questions. Hem explained that R.P. "cannot focus a long time" and "will just say things that aren't true without thinking about it" unless granted a "break" from questioning. Hem also denied that he or Rita had ever "coached" R.P.'s testimony regarding the assault.

R.P. was examined regarding her comprehension of an oath and ability to tell the truth. The prosecutor asked, "[I]f I were to say this wall behind you is black w[ould] that be telling the truth or telling a lie?" R.P. replied, "[t]elling the truth," despite confirming that the wall was "beige." During cross-examination, R.P. told counsel, "The color of your car is probably 2268 or something." When defense counsel asked the number of people to whom R.P. had reported the assault, R.P. described an unrelated incident in which an "Indian person" contacted her on social media and said that she was "sexy."

R.P. admitted that she had testified to "false facts" at the preliminary hearing; she stated that Bista's wife *had not* driven him to her home, and she had "purposely lied" about watching internet pornography. She explained that after the preliminary hearing, "My mom said that I

---

[10] In their briefs, the parties did not dispute that Bonilla was unavailable to testify at trial.

don't watch the videos" and said "I was lying." Continuing, R.P. testified, "My mom is trying to make me not think I watch" and "told me that it was a secret" and "does not want to tell that to the judge." R.P. also admitted that she had lied to her parents and teachers regarding unrelated matters. She maintained, however, that she was "telling the truth" about the assault and again described it in detail. Defense counsel asked R.P. specifically whether she had "ever changed [her] story about" the assault. R.P. responded, "Yeah," but maintained, "I just changed the part where [Bista's] grandma came into the house."[11]

The trial court found that R.P. had the capacity to "observe," "recall," and "communicate" events "to the extent that she has alleged to have been at home with [Bista] and has a recollection." The trial court also found that Rita "had some influence" on R.P.'s memory of "whether she was sodomized." On balance, the trial court determined that R.P. did not have the "capacity to comprehend the legal significance of an oath," "distinguish truth from a falsehood," or "understand the questions propounded and make intelligent answers." Accordingly, the trial court concluded that R.P. was "not competent to testify at this time."

On the motion to exclude the video of the forensic interview, the trial court concluded that Bonilla's statements were not testimonial hearsay because they were not offered for their truth, but to "give context" to R.P.'s responses during the interview. Accordingly, the trial court ruled those statements admissible. The trial court deferred ruling on the admissibility of R.P.'s interview statements and set a hearing for further argument.

D. Hearing on Motion to Reconsider Ruling on Admissibility under Code § 19.2-268.3

Bista moved the trial court to reconsider its ruling on the admissibility of R.P.'s out-of-court statements under Code § 19.2-268.3. In denying Bista's motion, the trial court

---

[11] From the context, it appears that R.P. was referring to Bista's wife driving him to R.P.'s residence before the assault, rather than Bista's grandmother.

explicitly considered each of the statutory factors and reiterated its previous findings. In addition, the trial court found that no evidence established "that [R.P] was in pain or distress when making the statements." The trial court concluded that "the totality of the circumstances" established that R.P.'s out-of-court statements to her parents, teacher, and Bonilla were "inherently trustworthy," notwithstanding R.P.'s "age," "mental infirmities," and prior "inconsistent statements." The trial court also found that the DNA evidence, Bista's inculpatory admissions, and Hem and Rita's testimony describing the incident sufficiently corroborated Bista's alleged acts of sexual abuse.

On the motion to exclude the forensic interview video, the trial court concluded that R.P.'s statements to Bonilla were testimonial hearsay but Bista previously had "the opportunity at the preliminary hearing to cross examine [R.P.] about the specific allegations."[12] Accordingly, the trial court ruled those statements admissible at trial.[13]

### E. Trial and Post-Conviction Proceedings

Neither R.P. nor Bonilla testified at trial. During opening statements, the Commonwealth and Bista advised the jury that R.P. was unavailable because the trial court had found her incompetent to testify.

The Commonwealth introduced the video of R.P.'s forensic interview and a transcript of her preliminary hearing testimony. The nurse who had conducted the "wellness check" testified

---

[12] During argument on the motion, Bista's counsel conceded that at the preliminary hearing, she had a copy of the forensic interview video and that the Commonwealth did not object during R.P.'s cross-examination. Defense counsel argued, however, that R.P.'s cross-examination during the preliminary hearing was insufficient because at the time "Bista was not charged with the crime of rape," R.P. was likely incompetent because of her autism, counsel had not received complete discovery concerning R.P.'s statements regarding the incident or school records disclosing R.P.'s history of IEPs, and R.P. later admitted to testifying falsely at the preliminary hearing.

[13] The trial court also granted the Commonwealth's separate motion to admit a transcript of R.P.'s preliminary hearing testimony at trial, over Bista's objection.

that the results of her examination of R.P. were "normal." Rita and Hem testified regarding the incident, and Rothe recounted R.P.'s disclosures.

Mimi Smith, a senior forensic analyst with the Virginia Department of Forensic Science, was qualified as an expert in "forensic biology and DNA and body fluids." Using "Y-chromosome" DNA analysis, she developed a "major profile" from a DNA mixture found in the interior of the "crotch" of the underpants R.P. had worn during the assault; the major profile comprised DNA from two male contributors. Smith eliminated Hem as a contributor but could not eliminate Bista—or "any of his patrilineally related male relatives"—as a contributor to the major profile.[14] Bista was the only member of his family present during the alleged assault.

During his case-in-chief, Bista introduced a transcript of R.P.'s testimony from the competency hearing and the trial court's order finding her incompetent to testify. Dr. Brandie Bartlett, an expert in "clinical and child psychology," testified that "people with autism have more difficulty maintaining lies." Based on her review of R.P.'s school records,[15] the transcript of her preliminary hearing testimony, and the forensic interview video, Dr. Bartlett opined that R.P. had "memory issues" and a limited capacity to "recall the details of a story in the correct sequence." In addition, Dr. Bartlett noted that R.P.'s academic history reflected that she required IEPs, failed standardized tests, and exhibited "hyperactivity," "inattentiveness," and "significant delays in expressive and receptive language."

Dr. Thomas McClintock, an expert in "forensic DNA analysis," testified that DNA can transfer among surfaces and degrade from contaminants. He opined that because R.P.'s clothing

---

[14] Smith testified that she observed the major profile zero times in 29,275 unrelated individuals, and applying a 95% upper confidence interval resulted in a frequency of approximately one in 2,800 individuals in the Caucasian population, 2,300 individuals in the African American population, and 2,000 individuals in the Hispanic population.

[15] The trial court admitted R.P.'s school records into evidence.

had been stored in a tied plastic bag for approximately six months, the DNA present in R.P.'s underpants may not have originated from Bista's direct physical contact, and "moisture" and "microbial growth" potentially contaminated the DNA. Dr. McClintock also testified that he had reviewed Smith's "raw data" and "could not exclude" Hem as a contributor to the "major" DNA profile recovered from the interior crotch of the underpants. In rebuttal, Smith testified that she observed no evidence of "mold" or DNA "degradation" during her analysis.

The Commonwealth argued to the jury that R.P.'s allegations were credible, emphasizing consistencies among R.P.'s out-of-court statements, prior testimony, and the DNA evidence. Bista countered that the "Commonwealth's entire case rises and falls on whether or not you believe [R.P.]" and asserted there was "absolutely no reason" to do so. Citing specific examples from R.P.'s school records, Bista argued that she was unable to provide an accurate account or discern the truth. Continuing, Bista argued that autistic children "can't maintain their lie and that's exactly what we have here." Bista urged the jury to disbelieve R.P. because her competency hearing testimony proved that she "clearly" lacked any "understanding of what it means to tell the truth or to tell a lie," which he asserted—without objection—was the reason R.P. had been declared incompetent to testify. Noting multiple inconsistencies in R.P.'s accounts—including numerous examples from R.P.'s forensic interview statements—Bista argued that R.P. "is incredibly influenced by things her parents say," her assertions were sometimes physically impossible, and "[w]e know that every single thing that [she] has said has been inconsistent with something previously." Bista concluded that R.P. "cannot be believed."

- 11 -

The jury convicted Bista of sodomy of a child under the age of thirteen years by a person eighteen years of age or older and aggravated sexual battery. The trial court denied Bista's subsequent motion to set aside the jury's verdict.[16] Bista appeals.

## ANALYSIS

### I. Admissibility of the Child's Out-of-Court Statements

#### A. Standard of Review

This Court "review[s] a trial court's decision to admit or exclude evidence" for abuse of discretion and "will not disturb a trial court's decision to admit evidence absent a finding of abuse of that discretion." *Kenner v. Commonwealth*, 299 Va. 414, 423 (2021) (quoting *Avent v. Commonwealth*, 279 Va. 175, 197 (2010)). When evaluating a trial court's evidentiary ruling, "we do not substitute our judgment for that of the trial court. Rather, we consider only whether the record fairly supports the trial court's action." *Carter v. Commonwealth*, 293 Va. 537, 543 (2017) (quoting *Grattan v. Commonwealth*, 278 Va. 602, 620 (2009)). "Only when reasonable jurists could not differ can we say an abuse of discretion has occurred." *Lambert v. Commonwealth*, 70 Va. App. 740, 749 (2019) (quoting *Thomas v. Commonwealth*, 44 Va. App. 741, 753, *adopted upon reh'g en banc*, 45 Va. App. 811 (2005)). The "abuse-of-discretion standard [also] includes review to determine that the discretion was not guided by erroneous legal conclusions." *Carter*, 293 Va. at 543-44 (alteration in original) (quoting *Porter v. Commonwealth*, 276 Va. 203, 260 (2008)). "In determining whether the trial court made an error of law, 'we review the trial court's statutory interpretations and legal conclusions *de novo*.'" *Auer v. Commonwealth*, 46 Va. App. 637, 643 (2005) (quoting *Rollins v. Commonwealth*, 37

---

[16] During argument on the motion, Bista's trial counsel reiterated that R.P.'s cross-examination during the preliminary hearing did not satisfy the Confrontation Clause because after the hearing, the Commonwealth brought an additional charge, Bista received more discovery and school records, R.P. admitted to falsely testifying at the preliminary hearing, and the trial court found her incompetent to testify.

Va. App. 73, 79 (2001)); *see also Cortez-Rivas v. Commonwealth*, 300 Va. 442, 444 (2022) (observing that appellate courts review de novo "whether the admission of evidence violates a defendant's confrontation right" (quoting *Logan v. Commonwealth*, 299 Va. 741, 745 (2021))).

"The measure of the burden of proof with respect to factual questions underlying the admissibility of evidence is proof by a preponderance of the evidence." *Campos v. Commonwealth*, 67 Va. App. 690, 702 (2017) (quoting *Witt v. Commonwealth*, 215 Va. 670, 674 (1975)). A trial court resolves factual questions underlying admissibility. *Bloom v. Commonwealth*, 262 Va. 814, 821 (2001). Such findings are binding on appeal "unless 'plainly wrong' or without evidence to support them." *Campos*, 67 Va. App. at 702 (quoting *McGee v. Commonwealth*, 25 Va. App. 193, 198 (1997) (en banc)).

### B. The trial court properly construed and applied Code § 19.2-268.3.

Bista contends that R.P.'s out-of-court statements concerning the sexual abuse were inadmissible under Code § 19.2-268.3 because "[o]nce [R.P.] was declared incompetent to testify, her statements no longer met the requirement of being inherently trustworthy." Bista also argues that the trial court improperly weighed the statutory factors to conclude that R.P.'s statements were inherently trustworthy. Bista maintains that R.P.'s statements were "inherently *un*trustworthy" considering her falsehoods, inconsistent accounts, and "attention-seeking" behavior. Finally, Bista contends that the record lacks the "corroborative evidence" of the alleged acts of sexual abuse Code § 19.2-268.3(B)(2)(b) requires. We disagree.

"The primary purpose of statutory interpretation 'is to ascertain and give effect to legislative intent.'" *Holloway v. Commonwealth*, 72 Va. App. 370, 375 (2020) (quoting *Botkin v. Commonwealth*, 296 Va. 309, 314 (2018)). This Court "determines legislative intent from the words employed in the statute." *Botkin*, 296 Va. at 314 (quoting *Alger v. Commonwealth*, 267 Va. 255, 259 (2004)). "When the language of a statute is unambiguous, we are bound by the

- 13 -

plain meaning of the words used." *Antisdel v. Ashby*, 279 Va. 42, 48 (2010). Moreover, we

"'presume that the legislature chose, with care, the specific words of the statute' and that '[t]he

act of choosing carefully some words necessarily implies others are omitted with equal care.'"

*VEPCO v. State Corp. Comm'n*, 300 Va. 153, 163 (2021) (alteration in original) (quoting

*Wal-Mart Stores East, LP v. State Corp. Comm'n*, 299 Va. 57, 70 (2020)). "Courts are not

permitted to rewrite statutes. This is a legislative function. The manifest intention of the

legislature, clearly disclosed by its language, must be applied." *Chesapeake Hosp. Auth. v. State

Health Comm'r*, ___ Va. ___, ___ (May 19, 2022) (quoting *Anderson v. Commonwealth*, 182

Va. 560, 566 (1944)).

### 1. Competency and Admissibility under Code § 19.2-268.3

As a matter of first impression, we must determine whether Code § 19.2-268.3

categorically bars a child victim's out-of-court statements describing any act directed against the

child relating to an offense against children when, as here, the trial court has found the child

incompetent to testify. We hold that it does not.

Code § 19.2-268.3 creates a hearsay exception for the out-of-court statements of child

victims of specified crimes, provided that: (1) "the time, content, and totality of circumstances

surrounding the statement[s]" provide "sufficient indicia of reliability" to render the statements

"inherently trustworthy," and (2) the child testifies or is declared unavailable to testify. Code

§ 19.2-268.3(B). To determine whether the statements are "inherently trustworthy," the trial

court "may consider" six non-exclusive enumerated factors. Code § 19.2-268.3(B)(1)(a)-(f). If

the child is declared unavailable to testify, the statute mandates that there must be "corroborative

evidence of the act relating to an alleged offense against children." Code § 19.2-268.3(B)(2)(b).

Read plainly, Code § 19.2-268.3 does not predicate admissibility on the child's

competency to testify. *See Chenevert v. Commonwealth*, 72 Va. App. 47, 57 (2020) (holding

- 14 -

that the "only" limitations on admissibility under Code § 19.2-268.3 are those the statute

expressly contains). To the contrary, the statute expressly contemplates that some children will

be unavailable and addresses that circumstance by requiring "corroborative evidence of the act"

giving rise to the charge. Code § 19.2-268.3(B)(2)(b). But Bista's proposed categorical rule that

a finding of incompetency necessarily renders the out-of-court statement inadmissible is

inconsistent with the statute's express provision for exactly that circumstance. We may not

"rewrite" the statute to include a competency requirement that the General Assembly has

omitted. *Chesapeake Hosp. Auth.*, ___ Va. at ___ (quoting *Anderson*, 182 Va. at 566).

Accordingly, we decline Bista's invitation to do so. *Cf. Chenevert*, 72 Va. App. at 57 (declining

to construe Code § 19.2-268.3 as limiting admissibility to statements made during forensic

interviews).[17]

Fortifying this conclusion, the United States Supreme Court has considered similar

statutes in the context of the Confrontation Clause and recognized that a child sexual assault

victim's incompetency to testify does not *per se* render the child's out-of-court disclosures

inadmissible. In *Ohio v. Clark*, 576 U.S 237, 250-51 (2015), the Supreme Court held that the

trial court's admission of a three-year-old child abuse victim's hearsay statements under Ohio's

"tender years" statute[18] did not violate the Confrontation Clause, despite the child's

---

[17] Other state courts have considered so-called "tender years" statutes similar to Code § 19.2-268.3 and held that a child sexual assault victim's incompetency to testify does not automatically preclude admission of the child's out-of-court disclosures of abuse. *See, e.g.*, *Commonwealth v. Walter*, 93 A.3d 442, 452 (Pa. 2014) (holding that a child's competency to testify "is a distinct issue from the admissibility of a child's out-of-court statements" under tenders years statute); *In re Cindy L.*, 947 P.2d 1340, 1353 (Cal. 1997) (holding that a child's "truth competence is a factor in determining the reliability of a hearsay statement" but "not necessarily" dispositive); *State v. Doe*, 719 P.2d 554, 557-59 (Wash. 1986) (en banc) (holding that a child victim's incompetency did not bar admission of his hearsay statements under statutory tender years act). Although not binding on this Court, such authority is persuasive.

[18] Ohio's tender years statute allows hearsay by certain child victims describing completed or attempted acts of "sexual activity" or "physical harm" if, in addition to other

unavailability for cross-examination due to his incompetency to testify. The Supreme Court

reasoned that "at the time of the founding," common law courts "regularly admitted" hearsay

from child sexual assault victims despite their unavailability because of their incompetency. *Id.*

at 249. Similarly, in *Idaho v. Wright*, 497 U.S. 805, 824 (1990),[19] the Supreme Court held that

even though the trial court had found the child victim incompetent to testify at trial, the

admission of her out-of-court statements describing her sexual abuse under Idaho's residual

hearsay exception[20] did not violate the Sixth Amendment. The Supreme Court expressly rejected

the contention that the child's out-of-court statements were "*per se* unreliable, or at least

presumptively unreliable, on the ground that the trial court found [her] incompetent to testify at

trial." *Id.* The Supreme Court emphasized that the "Confrontation Clause does not erect a *per se*

rule barring the admission of prior statements of a declarant who is unable to communicate to the

jury at the time of trial." *Id.* at 825.

In sum, the plain language of Code § 19.2-268.3 dispels Bista's claim that the statute

categorically bars the admission of a child's out-of-court statement when the trial court has found

that child incompetent to testify. That the United States Supreme Court and other state courts

have rejected similar claims solidifies this conclusion. Accordingly, we hold that the trial court

---

requirements, "the court finds that the totality of the circumstances surrounding the making of the statement provides particularized guarantees of trustworthiness that make the statement" reliable and "there is independent proof of the sexual activity." Ohio Evid. R. 807(A)(1).

[19] *Crawford v. Washington*, 541 U.S. 36, 52 (2004), and its progeny have since overruled *Wright*'s progenitor, *Ohio v. Roberts*, 448 U.S. 56 (1980), by supplanting the "reliability test" with the now-familiar "primary purpose" test for determining whether the admission of hearsay violates the Confrontation Clause. *See Davis v. Washington*, 547 U.S. 813, 823 (2006). Nevertheless, *Wright* remains informative in the context of interpreting hearsay statutes.

[20] Idaho Rule of Evidence 803(24)(A) made admissible out-of-court statements otherwise unaddressed by other exceptions to the rule against hearsay provided that, *inter alia*, the statements had "equivalent circumstantial guarantees of trustworthiness."

correctly concluded that R.P.'s incompetency to testify did not automatically render her hearsay statements inadmissible.

## 2. Weighing of Statutory Factors

Bista further contends that the trial court erroneously weighed the factors enumerated in Code § 19.2-268.3 to conclude that R.P.'s statements were inherently trustworthy. He argues that "inconsistencies" and falsehoods in R.P.'s multiple accounts of the assault, considered with her impaired "maturity and mental state" made her statements "inherently untrustworthy." Bista also argues that the trial court should have concluded from R.P.'s history of "attention-seeking behavior" that she had a "motive to falsify her claims." In essence, Bista asks this Court to reassess the trial court's factual conclusions.

We are "bound by the trial court's 'findings of historical fact unless "plainly wrong" or without evidence to support them.'" *Park v. Commonwealth*, 74 Va. App. 635, 645 (2022) (quoting *McGee*, 25 Va. App. at 198); *see McMillan v. Commonwealth*, 277 Va. 11, 18 (2009) (On appeal "great deference is given to the factfinder who, having seen and heard the witnesses, assesses their credibility and weighs their testimony." (quoting *Young v. Commonwealth*, 275 Va. 587, 590 (2008))). Thus, we must defer to the fact finder's responsibility "to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Abdullah v. Commonwealth*, 53 Va. App. 750, 755 (2009) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

The record supports the trial court's conclusion that R.P.'s statements to her parents, teacher, and Bonilla were inherently trustworthy. The evidence established R.P.'s "personal knowledge of the event" and that she provided detailed and largely-consistent accounts of the assault to her parents, teacher, and Bonilla. *See* Code § 19.2-268.3(B)(1)(a). Rita and Hem consistently testified that immediately after the assault, R.P. reported that Bista had touched and

- 17 -

"licked" her "private parts." Consistent with that disclosure, R.P. told Rothe that she had been raped by a family friend the previous summer in August. The video of R.P.'s forensic interview demonstrated that R.P. provided a detailed account of the assault consistent with her previous accounts. Furthermore, despite some discrepancies, R.P.'s testimony "did not waiver" with respect to the essential acts constituting the offenses. *See Nobrega v. Commonwealth*, 271 Va. 508, 518 (2006) (holding that a "child's mental health history" and "inconsistencies" in the child's account "bear[] on the weight to be given her testimony" but do not render such testimony inherently incredible). Moreover, the trial court expressly considered R.P.'s "age, maturity, and mental state" and determined that she had "a very detailed recollection of the event," notwithstanding "some inconsistencies" in her account and being "mildly autistic." *See* Code § 19.2-268.3(B)(1)(b). The trial court also had the opportunity to watch and listen to Hem, Rita, and Rothe testify concerning R.P.'s statements and expressly concluded that they were credible. *See* Code § 19.2-268.3(B)(1)(c).

Although R.P. engaged in "attention-seeking" behavior at school, no evidence suggests she did so at home or in other settings. Nor did any evidence establish that she harbored any animus toward Bista before the incident. Furthermore, Hem testified that he did not "coach" R.P.'s testimony, Bista was a close family friend, and Hem had refrained from contacting police due to fear of embarrassment in the Nepali community. From that evidence, the trial court reasonably concluded that neither R.P. nor her family had a motive to "falsify or distort" the alleged offenses. Code § 19.2-268.3(B)(1)(d). The trial court also found no evidence that R.P. was "suffering pain or distress" during the disclosures. Code § 19.2-268.3(B)(1)(e). Finally, the record contained "extrinsic evidence" establishing Bista's "opportunity to commit" the assault. *See* Code § 19.2-268.3(B)(1)(f). Rita found Bista kneeling on the floor behind R.P., who was in

"dog" position and partially nude. In addition, Bista's DNA was inside of R.P.'s underpants and he admitted to Hem and Rita that he had "licked" R.P.'s "private part."

Viewing that evidence under our deferential standard of review, we cannot conclude that the trial court's findings were plainly wrong or without evidentiary support. *Park*, 74 Va. App. at 645 (quoting *McGee*, 25 Va. App. at 198). Accordingly, we hold that the trial court did not abuse its discretion by admitting R.P.'s out-of-court statements under Code § 19.2-268.3. *Id.*

### 3. Corroborative Evidence

Bista further contends that "[a]bsolutely no corroborative evidence existed" of the alleged acts of rape, sodomy, and aggravated sexual battery to satisfy Code § 19.2-268.3(B)(2)(b). He argues that the evidence established at most his mere "opportunity" to commit the crimes, which he contends is insufficient.

Code § 19.2-268.3 does not define "corroborative evidence." In general, "when a particular word in a statute is not defined therein, a court must give it its ordinary meaning." *Moyer v. Commonwealth*, 33 Va. App. 8, 35 (2000) (en banc). "Corroboration" denotes "confirmation or support by additional evidence or authority." *Corroboration*, *Black's Law Dictionary* (11th ed. 2019). We have held that in general, "[c]orroborative evidence is such evidence as tends in some degree, of its own strength and independently, to support some essential allegation or issue." *Haas v. Commonwealth*, 74 Va. App. 586, 629 (2022) (quoting *Commonwealth v. Proffitt*, 292 Va. 626, 638 (2016)). Such evidence "tends to confirm and strengthen" a witness's testimony by "show[ing] the truth, or the probability of its truth." *Penn v. Manns*, 221 Va. 88, 93 (1980) (quoting *Brooks v. Worthington*, 206 Va. 352, 357 (1965)). Corroborative evidence need not "be sufficient to support a verdict" or remove "all doubt," but only provide "more strength than was had before." *Id.* (quoting *Brooks*, 206 Va. at 357). There is no formula for determining what constitutes adequate corroboration; and "ea[ch] case must be

- 19 -

decided on its own facts and circumstances." *Seaboard Citizens Nat'l Bank of Norfolk v. Revere*, 209 Va. 684, 693 (1969) (quoting *Brooks*, 206 Va. at 357). Corroborative evidence includes "independent evidence connecting the declarant with the confessed crime," such as "testimony from other witnesses" and "physical evidence." *Rankins v. Commonwealth*, 31 Va. App. 352, 362 (2000), *overruled on other grounds in Crawford v. Washington*, 541 U.S. 36, 52 (2004). In addition, we have recognized that "admissions from the defendant corroborating the challenged hearsay" are often especially compelling. *Henderson v. Commonwealth*, 59 Va. App. 641, 650 (2012), *aff'd*, 285 Va. 318 (2013).

The record contains corroborative evidence of Bista's acts relating to R.P.'s alleged rape, sodomy, and aggravated sexual battery. Forensic testing proved that Bista could not be eliminated as a contributor to a DNA mixture discovered in the interior crotch of R.P.'s underpants. Rita also testified that she observed Bista kneeling behind R.P., whose shorts were drawn below her knees. Finally, Bista confessed that he "licked" R.P.'s "private part." Collectively, that corroborative evidence satisfies Code § 19.2-268.3(B)(2)(b).[21]

C. Bista has not established that he did not have a prior opportunity to cross-examine R.P.

Bista argues that even if the statements were otherwise admissible under Code § 19.2-268.3, the trial court's admission of the forensic interview video violated the Sixth Amendment. He contends that the video contained testimonial hearsay but neither R.P. nor Bonilla was "subject to cross-examination" at trial.[22] Conceding that he had a prior opportunity

---

[21] In his brief, Bista asks this Court to conclude that there was insufficient corroborative evidence based on cases concerning *corpus delicti* necessary to corroborate a defendant's extrajudicial confession. The authorities upon which Bista relies are inapposite because they address a distinct quantum of proof: *sufficiency* to sustain a conviction, rather than *admissibility* of evidence.

[22] In their briefs, the parties do not dispute that R.P. and Bonilla were unavailable to testify at trial.

to cross-examine R.P. at the preliminary hearing, Bista maintains that various circumstances prevented his counsel from conducting a "complete cross-examination" sufficient to satisfy his right to confrontation.  We disagree.

The Confrontation Clause of the Sixth Amendment to the United States Constitution, made applicable to the States via the Fourteenth Amendment, provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."  U.S. Const. amend. VI.  The Sixth Amendment bars a witness's testimonial statement against a defendant "unless the witness appears at trial or, if the witness is unavailable, the defendant had a prior opportunity for cross-examination."  *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 309 (2009).  But "[t]he Confrontation Clause guarantees only an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish."  *Campos*, 67 Va. App. at 703 (emphasis added) (quoting *Abney v. Commonwealth*, 51 Va. App. 337, 350 (2008)); *accord Massey v. Commonwealth*, 67 Va. App. 108, 134 (2016).  Moreover, the constitutional protection applies solely to "testimonial hearsay."  *Davis v. Washington*, 547 U.S. 813, 823 (2006); *accord Wimbish v. Commonwealth*, 51 Va. App. 474, 486 (2008).  In determining whether a statement is testimonial, courts ask "whether, in light of all the circumstances, viewed objectively, the 'primary purpose' of [the statement] was to 'creat[e] an out-of-court substitute for trial testimony.'"  *Logan*, 299 Va. at 745 (alterations in original) (quoting *Clark*, 576 U.S. at 245).

### 1. Bonilla's Statements

The Confrontation Clause did not apply to Bonilla's statements because they were not hearsay.  "Hearsay is an out-of-court statement offered for the truth of the matter asserted therein."  *Davis v. Commonwealth*, 73 Va. App. 500, 507 (2021) (citing Va. R. Evid. 2:801(c)).  "[I]f the value of the evidence is not tied to its credibility—*i.e*. is not offered for its truth—then

the hearsay rule does not operate to exclude it." *Id.* at 508 (citing *Winston v. Commonwealth*, 268 Va. 564, 591 (2004)). "A statement offered to provide context to an admission is not hearsay because it is not offered to prove the truth of the matter asserted therein." *Swain v. Commonwealth*, 28 Va. App. 555, 560 (1998). At trial, the Commonwealth did not offer Bonilla's statements for their truth, but solely to "provide context" for the jury to understand R.P.'s disclosures of sexual abuse. As non-hearsay, Bonilla's statements did not implicate the Confrontation Clause. *Cf. Wimbish*, 51 Va. App. at 486 (holding that the Confrontation Clause did not apply to a police officer's non-hearsay statements). Accordingly, there is no error in the trial court's admission of Bonilla's statements. *Id.*

## 2. R.P.'s Statements

Although the trial court held that R.P.'s statements during the forensic interview were testimonial hearsay, we cannot conclude that their admission deprived Bista of his right to confrontation.

Bista acknowledges that he had a prior opportunity to cross-examine R.P. at the preliminary hearing, but asserts that the examination was defective because at the time: (1) Bista "did not face a rape charge"; (2) "[n]either complete discovery nor all of [R.P.'s] school records had been disclosed"; (3) Bista was unaware of additional statements "to R.P.'s parents and her teacher" admitted at trial; (4) R.P. "purposefully" lied regarding certain facts; and (5) R.P.'s autism—"the condition that rendered her incompetent"—made her cross-examination "meaningless." Our case law compels a different conclusion.

In *Massey*, this Court rejected a similar argument. In *Massey*, the victim in a prosecution for rape and abduction died after testifying at the preliminary hearing but before trial. 67 Va. App. at 118-19. During the preliminary hearing, the victim claimed that she was unable to recall details of the incident. *Id.* at 116-18. After the preliminary hearing, the Commonwealth

- 22 -

indicted Massey on an additional charge of abduction with intent to defile. *Id.* at 118. The Commonwealth also disclosed phone records and photographs that contradicted the victim's preliminary hearing testimony. *Id.* Massey moved *in limine* to exclude the victim's preliminary hearing testimony from trial, arguing that admitting the preliminary hearing transcript into evidence would violate the Confrontation Clause. *Id.* He contended that he had not had a full opportunity to cross-examine the victim at the preliminary hearing because the Commonwealth indicted him on the additional charge after the hearing and disclosed phone records he could have used to impeach the victim. *Id.* Massey also argued that the victim's alleged forgetfulness had rendered her functionally "unavailable." *Id*. The trial court denied the motion. *Id.* At trial, Massey introduced numerous text messages that contradicted the victim's "memory lapses" and otherwise impeached her credibility. *Id.* at 134.

On appeal, Massey challenged the introduction of the victim's preliminary hearing testimony at trial as a violation of his right to confrontation. *Id.* at 123-24. This Court held that the additional charge was irrelevant because it arose from the same "factual basis" as the others and Massey had cross-examined the victim regarding those facts. *Id.* at 136. The phone records' untimely disclosure was also inconsequential because "[t]he fact that additional information that might have been used in the examination of a witness is discovered after the witness testifies does not render the examination infirm." *Id.* at 129. Further, by introducing the victim's contradictory text messages, Massey had impeached the victim's credibility at trial "through other means." *Id.* at 128. Accordingly, there was no violation of the Confrontation Clause. *Id.* at 134.

We find *Massey* dispositive of Bista's argument. As in *Massey*, it is immaterial that the Commonwealth indicted Bista for rape after the preliminary hearing because the new charge stemmed from the same "factual basis" and Bista rigorously cross-examined R.P. regarding those

facts. *Id.* at 136. Although Bista may have used previously-undisclosed school records or statements to conduct a more thorough cross-examination of R.P., that circumstance "[did] not render the examination infirm" because he introduced the impeaching information into evidence. *Id.* at 129. Notwithstanding R.P.'s late admission that she had lied at the preliminary hearing, Bista extensively cross-examined her specifically about her false testimony during the subsequent competency hearing and introduced that transcript into evidence. Finally, to the extent that Bista contends that R.P.'s autism rendered her *de facto* incompetent—and therefore "unavailable" during the preliminary hearing—this Court rejected Massey's analogous argument. *Id.* at 133-34. Moreover, Bista did not challenge R.P.'s competency to testify at the preliminary hearing. Indeed, he exploited R.P.'s autism to attack her credibility at trial by arguing that her mental condition made her incapable of telling the truth. "That this credibility attack did not result in an acquittal does not mean that appellant was denied his right of cross-examination." *Id.* at 134.

The dissent asserts that *Massey* is inapposite because it addresses only "whether a later-unavailable declarant's prior preliminary hearing transcript can be introduced at trial when the defendant had the opportunity to cross-examine that declarant at that preliminary hearing." According to the dissent, this case presents the "entirely different" question of "whether the general ability to cross-examine" a later-unavailable witness "at a pretrial hearing can satisfy the Confrontation Clause" if the Commonwealth did not introduce the witness's specific out-of-court testimonial statements later admitted at trial. As a matter of first impression, the dissent would hold that "out-of-court testimonial statements must be introduced by the Commonwealth at a prior hearing for a defendant to have a constitutionally adequate opportunity for cross-examination about those statements." Therefore, the dissent concludes that "Bista had no opportunity to cross-examine" R.P. about her forensic interview statements because the

Commonwealth did not introduce those statements or any testimony about them during the preliminary hearing.

The dissent's conclusions and proposed reversal are improperly based on an argument that Bista did not make. "No ruling of the trial court . . . will be considered as a basis for reversal unless an objection was stated with reasonable certainty at the time of the ruling, except for good cause shown or to enable this Court to attain the ends of justice." Rule 5A:18. Accordingly, "this Court 'will not consider an argument on appeal [that] was not presented to the trial court.'" *Farnsworth v. Commonwealth*, 43 Va. App. 490, 500 (2004) (alteration in original) (quoting *Ohree v. Commonwealth*, 26 Va. App. 299, 308 (1998)). Thus, appellate courts "will not consider an argument that differs from the specific argument presented to the trial court, even if it relates to the same general issue." *Edwards v. Commonwealth*, 41 Va. App. 752, 761 (2003) (en banc) (citing *Floyd v. Commonwealth*, 219 Va. 575, 584 (1978)). Moreover, "Rule 5A:18 applies to bar even constitutional claims." *Farnsworth*, 43 Va. App. at 500 (quoting *Ohree*, 26 Va. App. at 308).

At trial, Bista argued that he did not have a prior opportunity at the preliminary hearing to cross-examine R.P. about her forensic interview statements because five specific circumstances rendered the examination ineffective. He did not argue that the Commonwealth's failure to introduce the forensic interview statements or elicit testimony about them during the preliminary hearing deprived him of a prior opportunity to cross-examine R.P. Thus, Rule 5A:18 precludes reversing the trial court on that basis.[23]

_____

[23] Acknowledging that Bista did not assert the legal argument it raises *sua sponte*, the dissent resists this conclusion by asserting that "[w]hen a party properly preserves a question of constitutional or statutory interpretation," this Court "'is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law.'" *Infra* p. 44 (quoting *Reston Hosp. Ctr., LLC v. Remley*, 63 Va. App. 755, 773 n.11 (2014)).

In addition, the dissent strays beyond this Court's limited role by *sua sponte* crafting and advancing an appellate argument that Bista does not raise. "Simply put, '[i]t is not the role of the courts, trial or appellate, to research or construct a litigant's case or arguments for him or her.'" *Bartley v. Commonwealth*, 67 Va. App. 740, 746 (2017) (alteration in original) (quoting *Sneed v. Bd. of Pro. Resp. of the Sup. Ct. of Tenn.*, 301 S.W.3d 603, 615 (Tenn. 2010)). To the contrary, this Court has a "duty 'not to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it.'" *Va. Dep't of State Police v. Elliott*, 48 Va. App. 551, 554 (2006) (quoting *Hankins v. Town of Va. Beach*, 182 Va. 642, 644 (1944)). To address a question that is unasked and not properly before this Court is to offer "an impermissible advisory opinion." *Va. Mfrs. Ass'n v. Northam*, 74 Va. App. 1, 21 (2021). Yet the dissent does exactly that by recasting Bista's narrow argument— that specific circumstances prevented his counsel from effectively cross-examining R.P. before trial—to address novel constitutional questions not properly before this Court.

In sum, Bista has not established that he did not have a prior opportunity to cross-examine R.P. before trial. Properly framed, Bista's argument presents a narrow question that *Massey* squarely addresses. Although R.P.'s cross-examination at the preliminary hearing

---

We recognize that an appellate court may raise a legal theory *sua sponte* in appropriate cases involving questions of constitutional or statutory interpretation. Nonetheless, the dissent overlooks that this is the rare exception, not the rule. As the United States Supreme Court has cogently stated, "[o]ur adversary system is designed around the premise that the parties know what is best for them, and are responsible for advancing the facts and arguments entitling them to relief." *Greenlaw v. United States*, 554 U.S. 237, 243 (2008) (alterations in original) (quoting *Castro v. United States*, 540 U.S. 375, 386 (2003) (Scalia, J., concurring in part and concurring in judgment)). Therefore, in general, appellate courts "rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present." *Greenlaw*, 554 U.S. at 243. Accordingly, this Court has held that "we will not, nor should we, address issues *sua sponte* that were never argued." *Epps v. Commonwealth*, 46 Va. App. 161, 177 n.3 (2005), *aff'd on reh'g en banc*, 47 Va. App. 687 (2006), *aff'd*, 273 Va. 410 (2007). To do otherwise "would impermissibly place us in the role of advocate—far outside the boundaries of our traditional adjudicative duties." *Johnson v. Commonwealth*, 45 Va. App. 113, 116 (2005).

may have been less thorough than Bista "might desire," he identifies nothing in the record that rendered the examination constitutionally infirm. *Campos*, 67 Va. App. at 703; *cf. Massey*, 67 Va. App. at 130-31 (finding no Confrontation Clause violation where defendant had prior opportunity to cross-examine victim and introduced later-discovered impeachment materials at trial); *see also California v. Green*, 399 U.S. 149, 170 (1970) (holding trial court's admission of transcript of victim's preliminary hearing testimony did not violate the Confrontation Clause despite the victim's extensive "lapse of memory"). Accordingly, because Bista offers no other basis for reversal, we affirm the trial court's admission of R.P.'s forensic interview statements.

### 3. Harmless Error

Even assuming that the trial court erred in admitting the forensic interview statements, any error was harmless beyond a reasonable doubt. "The harmless-error concept is no mere prudential, judge-made doctrine of appellate review. Harmless error is a legislative mandate." *Commonwealth v. White*, 293 Va. 411, 419 (2017); *see* Code § 8.01-678 (mandating harmless error review in all cases). "Constitutional error, like other types of error, remains subject to analysis under the doctrine of harmless error." *White*, 293 Va. at 420 (quoting *Foltz v. Commonwealth*, 284 Va. 467, 472 (2012)); *see also Crawford v. Commonwealth*, 281 Va. 84, 101 (2011) (applying harmless error review to violation of the Sixth Amendment's Confrontation Clause). "The proper inquiry for constitutional harmless error is 'whether the [factfinder] *would have* returned the same verdict absent the error.'" *White*, 293 Va. at 421-22 (alteration in original) (quoting *Washington v. Recuenco*, 548 U.S. 212, 221 (2006)). "[W]hether such an error is harmless in a particular case depends upon a host of factors," including the "importance of the [tainted evidence] in the prosecution's case, whether [that evidence] was cumulative, the presence or absence of evidence corroborating or contradicting the [tainted evidence] on material points . . . [and] the overall strength of the prosecution's case." *Crawford*, 281 Va. at 101 (first

through fifth alterations in original) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986)).

The overall strength of the Commonwealth's case against Bista, independent of the forensic interview statements, was overwhelming. The transcript of R.P.'s preliminary hearing testimony—the admission of which is unchallenged on appeal—established that Bista had isolated her, pulled down her shorts and underpants, prevented her escape by physically forcing her into a "dog position," and licked her vagina and "butt" before penetrating both.[24] Corroborating that testimony, R.P.'s mother testified that she caught Bista essentially *en flagrante* as he knelt on the floor behind R.P., whose underpants were down, and Bista later confessed that he had "licked" R.P.'s "private part." Bista's DNA in the "interior crotch" of R.P.'s underpants, combined with the other evidence at trial, cemented his guilt.

The forensic interview statements were largely cumulative of other evidence already before the jury, including the transcript of R.P.'s preliminary hearing testimony. Although the Commonwealth relied on the forensic interview video during closing argument to emphasize consistencies among R.P.'s out-of-court statements and prior testimony, the video also contained numerous inconsistent statements that significantly diminished its corroborative value and that Bista relied on during closing argument to impeach R.P.s credibility, asserting that they contradicted her preliminary hearing testimony and were sometimes factually impossible. On balance, absent the forensic interview statements, the overall strength of the Commonwealth's case against Bista remains overwhelming. The forensic interview statements contributed little to the Commonwealth's case, and Bista leveraged their inconsistencies to his advantage. Accordingly, we find "beyond a reasonable doubt that a rational [factfinder] *would have* found

---

[24] While forcible sodomy under Code § 18.2-67.1 could include other acts, such as cunnilingus, the indictment here specified only "anal intercourse."

- 28 -

the defendant guilty absent the error." *White*, 293 Va. at 424 (quoting *Neder v. United States*, 527 U.S. 1, 18 (1999)); *cf. Crawford*, 281 Va. at 101-02 (holding trial court's admission of victim's *ex parte* affidavit violated the Confrontation Clause but was harmless beyond a reasonable doubt because the affidavit was cumulative of other evidence and overwhelming DNA and other corroborative evidence proved defendant's guilt).[25]

## II. Jury Instructions

At trial, Bista proffered two proposed jury instructions regarding witness competency. Instruction R provided:  "A person is incompetent to testify if the court finds that the person does not have sufficient physical or mental capacity to testify truthfully, accurately, or understandably."  Instruction S stated:  "A child is competent to testify if it possesses the capacity to observe events, to recollect and communicate them, and has the ability to understand questions and to frame and make intelligent answers, with a consciousness of the duty to speak the truth."

Bista argued that the instructions were necessary because the trial court had admitted the order finding R.P. incompetent to testify at trial.  He contended that if the trial court did not "tell [the jury] what incompetent means, they're left only to their imaginations" and could "draw

---

[25] Relying on the Montana Supreme Court's decision in *State v. Tome*, 495 P.3d 54 (Mont. 2021), the dissent asserts that admitting the forensic interview video was not harmless as to the sodomy charge because "[t]he specific evidence of anal penetration" was "sparse" compared to that proving aggravated sexual battery.  Therefore, the dissent concludes that it is not clear beyond a reasonable doubt that the jury would have found Bista guilty of sodomy without watching the video.

　　*Tome* is unpersuasive.  In *Tome*, the trial court admitted an unavailable child victim's hearsay statements at trial after denying Tome's specific request to depose her.  *Id.* at 58.  No other witnesses or physical evidence connected Tome to the crime.  *Id.* at 60.  The Montana Supreme Court held that admitting the statements violated the Confrontation Clause because Tome had no prior opportunity to cross-examine the victim about them.  *Id.* at 67.  Moreover, the error was not harmless because the statements were the sole evidence of Tome's guilt.  *Id.*

　　By contrast, the record here establishes that Bista not only could have cross-examined R.P. at the preliminary hearing about her forensic interview statements, but DNA and other corroborative evidence implicated him as the perpetrator.  Thus, *Tome* is inapposite.

- 29 -

negative inferences against" Bista. The Commonwealth responded that competency and credibility were different because credibility is a factual question for the jury; therefore, the instructions were "irrelevant" and would "confuse the jury." The trial court denied the proffered instructions. In its competency ruling, the trial court had stated that it did "not mean in any way that [the trial court] view[ed] the child's allegations against [Bista] to be untrustworthy." The trial court instead instructed the jury: "The Court's competency ruling explains [R.P.]'s unavailability at this trial. Credibility determinations as to witnesses and other evidence are determined by you."

On appeal, Bista contends that the proffered jury instructions were "vital" to his defense because the "only issue for the jury to decide" was the credibility and reliability of R.P.'s out-of-court statements. Therefore, he argues that in denying the proffered instructions, the trial court "hindered" his defense by preventing him from "being able to fully discuss with and explain to the jury what a finding of incompetence meant."

"When reviewing a trial court's refusal to give a proffered jury instruction, we view the evidence in the light most favorable to the proponent of the instruction." *Pena Pinedo v. Commonwealth*, 300 Va. 116, 118 (2021) (quoting *Commonwealth v. Vaughn*, 263 Va. 31, 33 (2002)). In general, "the matter of granting and refusing jury instructions rests 'in the sound discretion of the trial court.'" *Id.* at 121 (quoting *Cooper v. Commonwealth*, 277 Va. 377, 381 (2009)). But we review de novo whether a proffered jury instruction "accurately states the relevant law." *Graves v. Commonwealth*, 65 Va. App. 702, 707 (2016) (quoting *Sarafin v. Commonwealth*, 288 Va. 320, 325 (2014)). "This Court's 'sole responsibility in reviewing' the trial court's decision 'is to see that the law has been clearly stated and that the instructions cover all issues which the evidence fairly raises.'" *Id.* (quoting *Cooper*, 277 Va. at 381).

"[W]hen a principle of law is vital to a defendant in a criminal case, a trial court has an affirmative duty properly to instruct a jury about the matter." *Jimenez v. Commonwealth*, 241 Va. 244, 250 (1991). But "[n]o instruction should be given . . . 'which would be confusing or misleading to the jury.'" *Graves*, 65 Va. App. at 708 (alterations in original) (quoting *Mouberry v. Commonwealth*, 39 Va. App. 576, 582 (2003)). "If the principles set forth in a proposed instruction are fully and fairly covered in other instructions that have been granted, a trial court does not abuse its discretion in refusing to grant a repetitious instruction." *Fahringer v. Commonwealth*, 70 Va. App. 208, 211 (2019) (quoting *Joseph v. Commonwealth*, 249 Va. 78, 90 (1995)).

The trial court correctly denied Bista's proffered jury instructions because they created a risk of confusing or misleading the jury and the alternative instruction fairly covered the same issues. Under Virginia law, witness credibility and competency to testify are distinct determinations, the former reserved to the fact finder and the latter to the trial court. *See Durant v. Commonwealth*, 7 Va. App. 454, 462 (1988) (holding that although a judge presiding in a jury trial determines a witness's competency to testify, "the weight to be given to the evidence and a determination of the witness's credibility are matters for the fact finder to decide"). Instructions R and S would have advised the jury that *the trial court* had already determined that R.P. was unable to discern the truth. Thus, the proffered instructions might have confused the jury by suggesting that the trial court's competency ruling was a commentary on R.P.'s credibility. By contrast, the trial court's alternative instruction "fully and fairly" covered the same issue by accurately stating the law while avoiding any such risk. *Fahringer*, 70 Va. App. at 211 (quoting *Joseph*, 249 Va. at 90). Accordingly, we hold that the trial court did not abuse its discretion in denying Bista's proffered jury instructions.

III. Closing Argument

At a pretrial hearing, the Commonwealth moved the trial court to preclude Bista from arguing to the jury that R.P. was incredible because she had been found incompetent to testify. The Commonwealth argued that competency and credibility were distinct determinations, but conceded that the trial court's competency ruling itself was admissible to explain R.P.'s absence from trial. Bista countered that in finding R.P. incompetent to testify, the trial court had determined "that she's not credible" because competency "is part of the credibility analysis." Thus, Bista argued that the jury was entitled to "consider that analysis." The trial court ruled that Bista could inform the jury that R.P. was not present because the trial court had declared her incompetent but could not attack her credibility on that basis.

On appeal, Bista contends that the trial court erroneously limited his closing argument. He argues that because the trial court admitted the order ruling R.P. incompetent to testify, the trial court should have allowed him to "argue to the jury that it affected [R.P.'s] credibility." Bista also asserts that the trial court allowed the Commonwealth significant leeway to argue "about why [R.P.] was believable," while denying Bista "the same latitude."

"The doctrine of judicial restraint dictates that we decide cases 'on the best and narrowest grounds available.'" *Commonwealth v. Swann*, 290 Va. 194, 196 (2015) (quoting *McGhee v. Commonwealth*, 280 Va. 620, 626 n.4 (2010)). The best and narrowest grounds may include a finding that an error is harmless as a matter of law. *See* Code § 8.01-678; *see also Kirby v. Commonwealth*, 50 Va. App. 691, 699 (2007) (noting that the harmless error doctrine is a legislative mandate explicitly limiting the power of appellate courts). Under the harmless error doctrine governing non-constitutional errors, "if there was 'a fair trial on the merits and substantial justice has been reached, no judgment shall be arrested or reversed . . . for any . . . defect, imperfection, or omission in the record, or for any error committed on the trial.'" *Shifflett*

*v. Commonwealth*, 289 Va. 10, 12 (2015) (alterations in original) (quoting Code § 8.01-678). If "the error did not influence the jury, or had but slight effect, the verdict and the judgment should stand." *Lienau v. Commonwealth*, 69 Va. App. 254, 270 (2018) (quoting *Clay v. Commonwealth*, 262 Va. 253, 260 (2001)).

We conclude that any error in the trial court's pretrial ruling was harmless. Despite Bista's argument that the trial court erroneously restricted his closing argument because the jury was entitled to infer from R.P.'s incompetency to testify that she was incredible, the central theme of Bista's closing argument made exactly that point. Bista argued to the jury that "the Commonwealth's entire case rises and falls on whether or not you believe [R.P.]" and asserted that there was "absolutely no reason" to credit her allegations. The record shows that Bista repeatedly argued—without the Commonwealth's objection or the trial court's intervention—that the jury should disbelieve R.P. because her competency hearing testimony proved she could not distinguish between "truth" or "a lie." In addition, Bista argued that R.P.'s autism rendered her incapable of discerning the truth, asserting that autistic children "can't maintain their lie and that's exactly what we have here." Thus, although Bista complains that the trial court's rulings precluded him from arguing to the jury that R.P.'s statements were incredible because of her incompetency, the record belies that claim.

Bista's contention that the trial court allowed the Commonwealth greater latitude to argue regarding R.P.'s credibility is also meritless. A review of the trial transcripts demonstrates that Bista's closing argument comprised fifty-six pages of extensive argument devoted to challenging R.P.'s credibility, including attacks based on R.P.'s incompetency to testify.[26] Indeed, the jury's

---

[26] By comparison, the Commonwealth's closing argument comprised only twenty-one pages.

acquittal of Bista on the rape charge supports the conclusion that the jury fully considered Bista's arguments and weighed R.P.'s credibility accordingly.

In sum, Bista now complains of being deprived of the opportunity to make the very arguments he made to the jury without limitation. Accordingly, we conclude that if the trial court did err, such error "had but slight effect" and "the verdict and the judgment should stand." *Lienau*, 69 Va. App. at 270 (quoting *Clay*, 262 Va. at 260).

CONCLUSION

For the foregoing reasons, we affirm the trial court's judgment.

*Affirmed.*

Lorish, J., concurring in part, and dissenting in part.

The Confrontation Clause[27] is "[o]ne of the bedrock constitutional protections afforded to criminal defendants." *Hemphill v. New York*, 142 S. Ct. 681, 690 (2022). "Testimonial statements of witnesses absent from trial" may only be constitutionally admitted at that trial "where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." *Crawford v. Washington*, 541 U.S. 36, 59 (2004). Bista argued below, and on appeal, that his Confrontation Clause rights were violated when the court allowed the jury to watch a 75-minute video depicting the victim's out-of-court testimonial forensic interview without giving Bista the opportunity to cross-examine the victim about that video at trial. And he argued below, and here, that his opportunity to generally cross-examine the victim at her preliminary hearing was not sufficient.[28] I agree.

---

[27] "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI.

[28] This question was preserved under Rule 5A:18. Prior to trial, Bista's counsel argued it would violate his Confrontation Clause rights to introduce the forensic interview at trial and argued that the opportunity to cross-examine the victim at the preliminary hearing was not constitutionally sufficient. The adequacy of this prior examination was squarely before the trial court, which specifically questioned Bista's counsel about whether she had "the statements made to [the forensic interviewer] at the time of the prelim." Bista maintained his objections at trial, after trial, and on brief here, arguing that the prior opportunity to cross-examine the victim at the preliminary hearing was insufficient because it was not "complete" and because "[t]he opportunity to cross-examine [the victim] at the preliminary hearing was insufficient to satisfy the mandates of the 6th Amendment." *Cf. Farnsworth v. Commonwealth*, 43 Va. App. 490, 501 (2004) (because the appellant "failed to make any argument concerning the Full Faith and Credit Clause before the trial court" he could not raise the constitutional question "for the first time on appeal"); *Edwards v. Commonwealth*, 41 Va. App. 752, 761 (2003) (en banc) (Rule 5A:18 precluded appellant from arguing that one offense was not lesser-included of another because the two had different statutory definitions of "law enforcement officer" when the only argument at trial was about whether one of the offenses required proof that the assailant had knowledge the victim was a law enforcement officer). Indeed, that Bista's argument centers on the adequacy of the prior opportunity to cross-examine the victim at the preliminary hearing was obvious to the Commonwealth, which suggested there was no constitutional issue "[b]ecause the victim's forensic interview was substantially similar to her testimony at the preliminary hearing, and because counsel was given an adequate opportunity to cross-examine the child victim about the allegations at the preliminary hearing." *See Wright v. Norfolk & W. Ry. Co.*, 245 Va. 160, 168

In this case of first impression, I conclude that a defendant cannot have a prior opportunity to cross-examine a witness about an out-of-court declaration at a preliminary hearing unless the Commonwealth elicited testimony about that declaration or introduced the statement into evidence at that hearing. The majority's reliance on caselaw addressing whether and when prior cross-examination is sufficient to admit prior testimony at a preliminary hearing is inapposite because Bista does not challenge the admission of statements made at the preliminary hearing. This case is about *out-of-court statements* made on a different occasion altogether. Because this error was not harmless under our heightened standard for constitutional errors, I respectfully dissent from Part I.C of the majority opinion with respect to the sodomy count.

    I. None of our prior cases hold that the general opportunity to cross-examine a declarant is equivalent to the opportunity to cross-examine that declarant *about specific prior out-of-court statements*.

The "principal evil at which the Confrontation Clause was directed was the civil-law mode of criminal procedure, and particularly its use of *ex parte* examinations as evidence against the accused." *Crawford*, 541 U.S. at 50.[29] "[T]he Framers would not have allowed admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to

_____

(1993) (explaining a purpose of Rule 5A:18 is to give the opposing party "the opportunity to meet the objection" (quoting *Weidman v. Babcock*, 241 Va. 40, 44 (1991))); *Solomon v. Atl. Coast Line R.R. Co.*, 187 Va. 240, 243 (1948) ("There is no necessity to apply [a procedural default] rule where the character of the objection is perfectly patent."). The majority's interpretation of Rule 5A:18 would require Bista to not only have raised the constitutional question (which he did), and argue that the preliminary hearing was not an adequate opportunity to cross-examine the victim (which he did), *but to affirmatively propose what the Commonwealth would have needed to do* to satisfy the Constitution.

    [29] In prior cases, we have assumed that the confrontation rights under the Virginia Constitution are equivalent to those under the Federal Constitution. Without consideration of the history of these particular clauses, we merely relied on the general principle that "[w]e have 'consistently held that the protections afforded under the Virginia Constitution are co-extensive with those in the United States Constitution.'" *Lilly v. Commonwealth*, 50 Va. App. 173, 184 (2007) (quoting *Rowley v. Commonwealth*, 48 Va. App. 181, 187 n.2 (2006)). Future cases might present the question of whether this assumption is supported through historical consideration and comparison of these clauses.

testify, and the defendant had had a prior opportunity for cross-examination." *Id.* at 53-54. The

only constitutionally prescribed method of confrontation is cross-examination.

This case is the first to present us with the question of whether the prior opportunity to

cross-examine required by the Confrontation Clause is *statement* or *declarant* specific. Our prior

cases have only considered whether a later-unavailable declarant's prior preliminary hearing

transcript can be introduced at trial when the defendant had the opportunity to cross-examine that

declarant at that preliminary hearing. We apply a four-part test to determine whether the

Confrontation Clause is satisfied when the prosecution seeks to introduce a preliminary hearing

transcript at a later trial where the witness is unavailable to testify:

> (1) that the witness is presently unavailable;
> (2) that the prior testimony of the witness was given under oath (or
> in a form of affirmation that is legally sufficient);
> (3) that the prior testimony was accurately recorded or that the
> person who seeks to relate the testimony of the unavailable witness
> can state the subject matter of the unavailable witness's testimony
> with clarity and in detail; and
> (4) that the party against whom the prior testimony is offered was
> present, and represented by counsel, *at the preliminary hearing*
> and was afforded the opportunity of cross-examination *when the*
> *witness testified at the preliminary hearing*.

*Longshore v. Commonwealth*, 260 Va. 3, 3-4 (2000) (emphases added); *Schneider v.*

*Commonwealth*, 47 Va. App. 609, 613 (2006) (affirming the pre-*Crawford* test "complies with

the new requirements of *Crawford* without alteration"). Only one of our prior cases examines

whether the opportunity to cross-examine at a particular preliminary hearing was enough to

satisfy the Confrontation Clause under the *Longshore* test. And the majority pegs everything on

this decision, *Massey v. Commonwealth*, 67 Va. App. 108 (2016). But under the Confrontation

Clause, the similarities between this case and *Massey* are meaningless in the shadow of the

differences.

Here is the similarity: In both *Massey* and this case, the appellants argued that the opportunity to cross-examine a later-absent witness at a preliminary hearing was not sufficient, in part because they obtained additional information after the hearing that they could not have used in that earlier cross-examination. The differences? In *Massey*, the prior testimonial statement at issue was the transcript from the very same preliminary hearing where Massey had been present, represented by counsel, and with the opportunity to cross-examine the witness about that testimony. This case is not about whether the Confrontation Clause prevents the admission at trial of the preliminary hearing transcript where the defendant had the opportunity to cross-examine the later unavailable victim. It is about whether a pretrial hearing, where the Commonwealth did not even mention the forensic interview—let alone introduce the transcript—allowed Bista the opportunity to cross-examine the declarant about these out-of-court statements.[30]

Said another way, all of our prior cases considering the admissibility of a prior testimonial statement are limited to examining whether the defendant could have cross-examined the witness *at the time the statement was made*. *See, e.g.*, *Longshore*, 260 Va. at 4 (requiring "that the party against whom the prior testimony is offered was present, and represented by counsel, *at the preliminary hearing* and was afforded the opportunity of cross-examination *when the witness testified at the preliminary hearing*" (emphases added)). This case presents the entirely different question of whether the general ability to cross-examine a witness at a pretrial hearing can satisfy the Confrontation Clause—without any mention at the hearing of the prior out-of-court testimonial statements.

---

[30] I agree with the majority's conclusion that the forensic interview was testimonial because "the circumstances objectively indicate that there [was] no such ongoing emergency, and that the primary purpose of the interrogation [was] to establish or prove past events potentially relevant to later criminal prosecution." *Davis v. Washington*, 547 U.S. 813, 822 (2006).

II. At a preliminary hearing, a defendant cannot effectively cross-examine a witness about prior statements that the Commonwealth never introduced or otherwise elicited testimony about.

There are categories of testimonial hearsay statements that by their very nature will take place outside the courtroom and outside the presence of the defendant. "Statements taken by police officers in the course of interrogations" are a prime example. *Crawford*, 541 U.S. at 52. As *Crawford* did not suggest that such statements were per se problematic under the Confrontation Clause, by implication, it is possible for such out-of-court statements to be subject to cross-examination in a manner that renders their later introduction at trial constitutional. But past cases have only found the Confrontation Clause is satisfied, in this circumstance, where the declarant is available to be cross-examined at the trial where the statements are introduced.[31]

As a matter of first impression, I would hold that out-of-court testimonial statements must be introduced by the Commonwealth at a prior hearing for a defendant to have a constitutionally adequate opportunity for cross-examination about those statements. In other words, that a declarant was generally subject to cross-examination is insufficient; she must be subject to cross-examination *concerning the out-of-court declaration*. Without this requirement, we will replicate the "principal evil at which the Confrontation Clause was directed" which was the "use of *ex parte* examinations as evidence against the accused." *Id.* at 50.

---

[31] For example, the Supreme Court affirmed the introduction of a prior affidavit at trial where the affiant testified at trial and was subject to cross-examination about the affidavit. *California v. Green*, 399 U.S. 149 (1970). *See also Marquis v. State*, 242 So. 3d 86, 90 (Miss. 2018) ("[T]he admission of the recording did not violate the Confrontation Clause of the Sixth Amendment, because Marquis had the opportunity to, and did, cross-examine J.D. at trial."); *State v. Poulor*, 932 N.W.2d 534, 538 (N.D. 2019) (affirming that introduction of complainant's video recorded statement did not violate the Confrontation Clause because the complainant was available and testified at trial).

While no other court has addressed this precise issue,[32] a leading treatise reaches the same conclusion. In *Federal Evidence*, Professors Christopher Mueller and Laird Kirkpatrick pose the scenario where an assault victim makes testimonial statements to police officers about her assault. 4 Christopher Mueller & Laird Kirkpatrick, *Federal Evidence* § 8:28 (4th ed. 2022). The victim then testifies at the preliminary hearing, "where she tells the whole story of what happened," and is subject to cross-examination, but is then unavailable at trial. *Id.* Acknowledging there would likely be no issue with introducing the transcript from that hearing, the treatise poses the separate question: what if the "prosecutor elects to call the officer to testify at trial to what the victim told him[?]" *Id.* After observing that "[w]e have not seen cases that consider this point," the treatise concludes "the right answer to this question is probably no." *Id.* While "the defense did have a chance to cross-examine the victim on what actually happened, and to test her memory, perception, and candor in describing the acts, events, and conditions in issue[,] . . . [t]he prior statement is certain to differ in some significant ways from the preliminary

---

[32] Other jurists and states have affirmed that the Confrontation Clause requires more than the general opportunity to cross-examine and that the prosecution must elicit the statements sought to be admitted at trial so that the defendant has the opportunity to cross-examine the witness about those statements. *See State v. Blue*, 717 N.W.2d 558, 566 (N.D. 2006) ("A witness's mere appearance at a preliminary hearing is not an adequate opportunity for cross-examination for purposes under the Confrontation Clause."); *In re Personal Restraint of Grasso*, 84 P.3d 859, 868 (Wash. 2004) (en banc) (finding that the admission of a child victim's hearsay statements did not violate the Confrontation Clause because the defendant "enjoyed the opportunity for full cross-examination about the alleged events *and* about [the] statements" (emphasis added)); *State v. Noah*, 162 P.3d 799, 807 (Kan. 2007) (Davis, J., concurring) ("Because I find that the requirements of unavailability and opportunity for cross-examination discussed in *Crawford* and *Davis* relate to the *statement* sought to be admitted at trial, not generally to the declarant who made that statement, I would hold that even a full cross-examination at some point previously in the proceedings would not allow a court to admit the victim's statements by way of other witness' testimony if the State did not first establish that *such statements had been subjected to cross-examination by offering into evidence the previous transcript*." (second emphasis added)); *State v. Rohrich*, 939 P.2d 697, 700-01 (Wash. 1997) (en banc) ("The opportunity to cross examine means more than affording the defendant the opportunity to hail the witness to court for examination. It requires the State *to elicit the damaging testimony* from the witness so the defendant may cross examine if he so chooses." (emphasis added)).

hearing testimony—otherwise why would a prosecutor offer it?"  Additionally, "[i]f the statement *also was not* offered at the preliminary hearing, the defense had no chance to test *the statement itself*, to probe the details that it relates, or to challenge the speaker about the statement in any way."  *Id.*  Indeed, "[w]hatever headway the defense might make in attacking the witness on her memory or accuracy in describing the events is a pale substitute for cross-examination that challenges the witness on the particular statement being offered in evidence."  *Id.*; *see also* 2 Barbara E. Bergman et al., *Wharton's Criminal Evidence* § 6:10.30 (15th ed. 2021) (explaining that "[e]ven if the prosecution puts a witness on the stand, it may not introduce his prior testimonial statements if it does not at least first ask the witness to relay the substance of the statements in court" because "[t]he Confrontation Clause 'requires the State to elicit damaging testimony from the witness so the defendant may cross examine if he so chooses'" (quoting *State v. Rohrich*, 939 P.2d 697, 701 (Wash. 1997) (en banc))).

That constitutionally sufficient cross-examination requires the Commonwealth to affirmatively introduce or elicit testimony about prior out-of-court statements is also compelled by the holding in *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 309-11 (2009).  Our Supreme Court explained that case this way: "In short, the [U.S.] Supreme Court held that a defendant's rights under the Confrontation Clause cannot be 'replaced by a system in which the prosecution presents its evidence via *ex parte* affidavits and waits for the defendant to subpoena the affiants if he chooses.'"  *Cypress v. Commonwealth*, 280 Va. 305, 315-16 (2010) (quoting *Melendez-Diaz*, 557 U.S. at 324-25).  Requiring the defendant to call the adverse witness "impermissibly relieves the prosecution of its burden to present its witnesses against a defendant."  *Id.* at 316; *see also Melendez-Diaz*, 557 U.S. at 324 ("More fundamentally, the Confrontation Clause imposes a burden on the prosecution to present its witnesses, not on the defendant to bring those adverse witnesses into court.").  A contrary rule would place a similar

duty on a defendant to first elicit prior statements through cross-examination at a pretrial hearing, and then to cross-examine the witness on the statements the defense just elicited.

Not only would this impermissibly relieve the prosecution of its burden to elicit out-of-court statements from a witness, it also contradicts the nature of cross-examination and our precedent governing the same. "In this Commonwealth, the cross-examination of a witness is limited to matters elicited on direct examination." *Smith v. Irving*, 268 Va. 496, 501 (2004). Indeed, the majority's silence suggests a defendant must conduct cross-examination far beyond what the Commonwealth elicited on direct at every preliminary hearing to be safe. This will dramatically expand the scope of these hearings where the Commonwealth carries the burden to show, merely, that there is probable cause of the charged criminal offenses. Criminal defendants will need to conduct full cross-examination on every potential out-of-court statement at every pretrial hearing to mitigate the risk that a witness is later found unavailable to testify at trial. Not only will this be inefficient and contrary to the limited purpose of pretrial hearings, but we have also repeatedly cautioned criminal defendants against stretching out preliminary hearings and turning them into vehicles for discovery. *See, e.g.*, *Williams v. Commonwealth*, 208 Va. 724, 729 (1968) (a defendant has no "right to call witnesses at the preliminary hearing for the purpose of discovery"); *see also* 4 Mueller & Kirkpatrick, *supra* (arguing that "[e]ven if the defense knew about the statement during the prior proceeding, there is no reason to burden the defense with raising it, and legitimate tactical considerations would likely incline the defense not to do so").[33] Moreover, prosecutors who harbor doubts about a witness's competence may now be

---

[33] The implications of this rule would extend even further. If the prior statement need not be introduced, or discussed, at a preliminary hearing for a defendant to have had the opportunity to cross-examine the witness about it, a defendant who waives a preliminary hearing entirely would also have had the theoretical opportunity to cross-examine the witness.

incentivized to withhold a prior out-of-court statement from a preliminary hearing where it would be subject to cross-examination.

Here, the Commonwealth did not introduce the forensic interview at the preliminary hearing and never asked the victim any questions about the statements she made during the forensic interview. The Commonwealth correctly points out that Bista's counsel vigorously cross-examined the victim on the testimony she provided *at the preliminary hearing* about the assault. But by its very nature, a cross-examination responds to testimony and evidence put forth on direct.

At trial, the jury was presented with a 75-minute video of the victim's forensic interview where she made numerous statements inconsistent with her testimony at the later preliminary hearing and also discussed many things that were never brought up at the preliminary hearing.[34] Bista had no opportunity to cross-examine the victim about these statements at the trial (because she was found not competent to testify)[35] or at the preliminary hearing. Indeed, that the court found the victim could not understand the meaning of testifying under oath or how to distinguish truth from falsehood, just months after the preliminary hearing, casts additional doubt on whether Bista could have effectively cross-examined the victim about statements in the forensic interview *even if* the Commonwealth had introduced them at that preliminary hearing. But I need not reach that question here.

---

[34] By way of example, during the forensic interview the victim described Bista kissing her on the mouth and alleged that he put his hands on her neck so tight that she looked like she was dying. She also described him dragging her shirt "like 20 times I mean like nine or ten times" and that it caused her to keep bumping her head. Finally, she said Bista had recorded the assault with a flip phone and that her grandmother had seen the videos.

[35] As explained by the majority, the victim was eleven at the time of the assault and suffered from autism spectrum disorder which impaired her socialization, memory, and ability to learn and communicate. Her mother estimated her mental age as that of a "four to five-year-old child." At the competency hearing, the victim admitted to testifying to "false facts" at the prior preliminary hearing.

III. The majority's failure to consider these issues results in an incomplete, and inaccurate, interpretation of the Confrontation Clause.

The majority ducks this issue entirely by suggesting that I rely on an argument Bista never made. But our dispute is not really about *sua sponte* consideration of an issue not raised below. It is about the grounds that an appellate court may consider in answering a question that was clearly preserved and presented.

When a party properly preserves a question of constitutional or statutory interpretation (*see* note 28), the party's focus on particular reasons or theories underscoring why a court's ruling was in error does not preclude us from identifying and applying the proper construction of the law without relying exclusively on those exact theories. Indeed, "[w]hen an issue or claim is properly before the court, the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law." *Reston Hosp. Ctr., LLC v. Remley*, 63 Va. App. 755, 773 n.11 (2014) (quoting *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 99 (1991)); *see also, e.g.*, *Epps v. Commonwealth*, 46 Va. App. 161, 199 (2005) (Humphreys, J., concurring in part and dissenting in part) (citing *Elliott v. Commonwealth*, 267 Va. 464, 472 (2004)) (explaining that "where a party has challenged the applicability of a particular statute on appeal, appellate courts always have the authority to raise and construe the plain meaning of that statute").

To justify its path of avoidance, the majority takes cover under general doctrines underlying our adversarial system and the role parties play in presenting the issues for our review. I agree that these principles shape our role when it comes to the issues parties have preserved below and the questions parties raise on appeal.[36] But I disagree that is it the "rare

---

[36] The majority relies on cases that address the wholesale creation of new issues on appeal, not the reasoning our Court may employ in resolving an issue that was preserved. For example, the oft-quoted statement about "impermissibly plac[ing] us in the role of advocate—far outside the boundaries of our traditional adjudicative duties," described the problem with

- 44 -

exception" for our courts to consider distinctions not specifically articulated by the parties in addressing the issues the parties have raised.[37]

Appellate courts do not hesitate to frame an issue that was preserved, and raised, to ensure that the answer is a full and correct statement of the law. Most of the time, this draws no objection. *See, e.g.*, *Hunter v. Hunter*, 298 Va. 414, 427 (2020) (explaining in a unanimous decision that appellant's arguments "require that we reframe the ultimate question"); *The Daily Press, LLC v. Commonwealth*, ___Va. ___, _ __ (Oct. 20, 2022) (summarizing parties' arguments and "disagree[ing] with how this question has been framed" in a unanimous opinion). For example, in unanimously reversing a circuit court for dismissing a cause of action based on negligent repair, our Supreme Court relied on a distinction between nonfeasance and misfeasance—originally recognized at common law—that the appellants never argued was meaningful in any way. *Tingler v. Graystone Homes, Inc.*, 298 Va. 63 (2019). Likewise, the Supreme Court unanimously reversed a circuit court's ruling on sanctions against a landlord after

_____

reversing a judgment that was supported by an alternate holding that the appellant never challenged. *Johnson v. Commonwealth*, 45 Va. App. 113, 116 (2005). Without the appellant raising any challenge to an independent reason that the judgment was supported, we explained why we could not *sua sponte* "raise a challenge on Johnson's behalf to the trial court's inevitable discovery ruling, conceive of a reason to find fault with it, and then use that reason as a basis for setting aside Johnson's conviction." *Id.* Of course, the majority appropriately concedes that we may consider new issues *sua sponte* in "appropriate cases involving questions of constitutional or statutory interpretation." This could be such an appropriate case even if Bista had not raised the issue, given the question of constitutional interpretation and the liberty interests at stake. But because he did raise and preserve the issue, I do not decide this question.

[37] Again, the majority's cited cases do not square with this one. The unobjectionable statement that it is not our role to "research or construct a litigant's case or arguments for him or her" comes from a case discussing an appellant's failure to sufficiently assert the principles of law, argument, and authorities under Rule 5A:20(e). *Bartley v. Commonwealth*, 67 Va. App. 740, 746 (2017) (quoting *Sneed v. Bd. of Pro. Resp. of the Sup. Ct. of Tenn.*, 301 S.W.3d 603, 615 (Tenn. 2010)). Whereas in *Bartley*, the appellant offered "no legal support" from any source, merely stating that he "does not believe that it is lawful for law enforcement, during the execution of a valid search warrant, to lure third parties onto the property so they can be searched too," there is no question that Bista briefed his Confrontation Clause argument and cited to relevant legal authority.

that landlord voluntarily dismissed an appeal from general district court to the circuit court, relying on "the text of Code § 8.01-271.1 [and] our opinions applying it." *Robinson Fam., LLC v. Allen*, 295 Va. 130, 139 (2018). But the landlord never argued on appeal that the sanctions decision was inconsistent with the text of Code § 8.01-271.1; instead, the landlord argued that the lawsuit had been filed in good faith and that withdrawal of an appeal was not proof of bad faith.

Occasionally, as here, the reframing of an issue becomes *the* issue. *See, e.g.*, *Jones v. Phillips*, 299 Va. 285, 316 (2020) (Goodwyn, J. dissenting) (arguing that majority "appears to resolve this case on the basis of a Black's Law Dictionary definition of disposition that was not argued before the circuit court or this Court, and to reverse the circuit court based upon an argument that the circuit court did not have the opportunity to consider"); *Shoemaker v. Funkhouser*, 299 Va. 471, 513 (2021) (Kelsey, J. dissenting) (arguing majority relies on an argument interpreting Code § 29.1-509(C) that the appellant never made).

So when should we limit our interpretation of the issues before us to parroting only the precise words and reasoning of the parties? The answer necessarily involves the exercise of judicial discretion. Here, there is no suggestion that Bista strategically elected against arguing that there is a distinction between the opportunity to cross-examine a declarant in general and the opportunity to cross-examine the declarant about a particular out-of-court statement. Nor does consideration of this distinction compromise any principle of fundamental fairness. Instead, considering this distinction is consistent with the rule that we "exercise our duty of judicial review with great circumspection," while also "honor[ing] the axiom that '[i]it is emphatically the province and duty of the judicial department to say what the law is.'" *Howell v. McAuliffe*, 292 Va. 320, 350 (2016) (second alteration in original) (quoting *Marbury v. Madison*, 5 U.S. 137, 177 (1803)). The majority's refusal to consider the logical endpoint of Bista's properly

preserved argument results in an inaccurate and incomplete interpretation of the Confrontation Clause, at significant cost to Bista today, but also to the basic principles underlying a fair trial for all future defendants.

IV.  The Confrontation Clause error was not harmless as to the sodomy charge.

Bista was convicted of two separate charges: one for aggravated sexual battery, and one for sodomy by anal penetration.[38]  To assess whether a constitutional error was harmless, we ask whether "absent the [constitutional error] is it clear beyond a reasonable doubt that the [factfinder] *would have* returned a verdict of guilty?"  *Commonwealth v. White*, 293 Va. 411, 421 (2017) (quoting *United States v. Hasting*, 461 U.S. 499, 510-11 (1983)).  In other words, we ask "whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction."  *Id.* at 420-21 (quoting *Chapman v. California*, 386 U.S. 18, 23 (1967)).

Considering the evidence of aggravated sexual battery[39] in the light most favorable to the Commonwealth, there was significant other evidence of this offense—the preliminary hearing transcript where the victim testified to the assault, testimony from the victim's mother who walked into a room where she saw her daughter's shorts drawn below her knees and Bista kneeling behind her, testimony from the mother that Bista confessed he had "licked" the victim's "private part," and forensic testing which could not eliminate Bista as a contributor to non-semen DNA found in the interior crotch of the victim's underwear.  Therefore, even assuming there was error in admitting the forensic interview, I concur with the majority that the error was harmless as to this count given the other evidence of aggravated sexual battery.

---

[38] While forcible sodomy under Code § 18.2-67.1 could include other acts, such as cunnilungus, the indictment here specified only "anal intercourse."

[39] Under Code § 18.2-67.3, aggravated sexual battery requires that the defendant sexually abuse the victim and, as relevant here, that the victim is under thirteen.

The specific evidence of anal penetration necessary to support the sodomy conviction, however, was comparatively sparse. In its briefing on appeal, the Commonwealth points only to the victim's testimony at the preliminary hearing and her forensic interview as evidence of the sodomy. The first time the victim alleged anal penetration was during the forensic interview.[40] She then testified to the same during the preliminary hearing. And her parents testified at trial that the victim told them at some point that Bista "put it on the front and tried to put it on the back." I cannot say it is clear *beyond a reasonable doubt* that the jury would have still returned a verdict of guilty without watching the 75-minute video of the victim speaking to the forensic interviewer.[41] And so I dissent from this conclusion in Part I.C of the majority opinion.

## CONCLUSION

That a child would be sexually assaulted is every parent's worst nightmare. That it was a family friend—known to the child as "grandpa"—who committed the assault, is unimaginable. But in the face of bad facts, we should resist the temptation to make bad law. For the reasons set forth above, I would affirm Bista's conviction for aggravated sexual battery, for which he is sentenced to serve 20 years of incarceration. But I would reverse Bista's conviction for forcible

---

[40] During the hearing on whether to permit the victim's statements under Code § 19.2-268.3, the victim's mother initially testified that the victim immediately disclosed to her "that he took his private part in my front and back both sides. He entered it." But the mother later clarified that the daughter only immediately alleged vaginal penetration. When both parents were interviewed by law enforcement, neither said, at that time, that the victim had disclosed anal penetration.

[41] The Supreme Court of Montana recently held that the admission of a forensic interview at trial violated the defendant's Confrontation Clause rights because the defendant had no opportunity to cross-examine the witness about the statements in the interview and concluded that introduction of the video was not harmless. *State v. Tome*, 495 P.3d 54 (Mont. 2021). "The jury heard from [the victim's] own lips how Tome had abused her, they saw her gestures, they observed her demeanor, and the video was a powerful presentation of the State's complaining witness—a witness who was out-of-reach and unavailable for cross-examination," and therefore, the introduction of this out-of-court statement was not harmless. *Id.* at 67.

sodomy, for which he received the mandatory minimum sentence of life imprisonment, and remand for a new trial, because the Confrontation Clause requires more.